CHARLES H. SIEGEL AND MARY ANN G. SIEGEL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EDGAR L. FEININGER AND GRACE K. FEININGER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8571–79, 8704–79.     Filed April 26, 1982.

*Sheldon E. Friedman* and *Robert J. Kaufman,* for the petitioners.

*Albert L. Sandlin, Jr.,* for the respondent.

SCOTT, *Judge*: In these consolidated cases, respondent determined deficiencies for the years and in the amounts as follows:

| Petitioners | Year | Deficiency in income tax |
|---|---|---|
| Charles H. Siegel and Mary Ann G. Siegel .... | 1974 | $19,529.29 |
| | 1975 | 7,551.53 |
| | 1976 | 7,169.49 |
| Edgar L. Feininger and Grace K. Feininger ..... | 1974 | 7,824.53 |
| | 1975 | 131.90 |
| | 1976 | 3,278.00 |

The issues for decision are (1) whether each petitioner, as a limited partner of D. N. Co., is entitled to a claimed deduction for a distributive share of losses reported by the partnership and, if so, in what amount; and (2) whether each petitioner is entitled to a claimed investment credit.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

All of petitioners resided in Atlanta, Ga., at the time of the filing of their petitions in this case. Charles H. Siegel and Mary Ann G. Siegel, husband and wife, filed joint Federal income tax returns for each of the calendar years 1974, 1975, and 1976. Edgar L. Feininger and Grace K. Feininger, husband and wife, filed joint Federal income tax returns for each of the calendar years 1974, 1975, and 1976.

During the years 1974, 1975, and 1976, Edgar L. Feininger and Charles H. Siegel (petitioners) were limited partners in D. N. Co., a limited partnership, of which Richard Bridges was the general partner. In 1972, Mr. Feininger was vice president

of Bryant Land Corp., a wholesale heating and air-conditioning company in Atlanta, Ga. In September 1972, he exercised an option to sell his 40-percent interest for $200,000, which amount was payable over the next 3 years. On July 31, 1973, he purchased a company called Economy Binder Co. and has remained with that firm since that time. Mr. Siegel graduated from Yale Law School in 1966, and at the time of trial, was the chairman of the board and executive vice president of R. A. Siegel Co., a wholesale distributor of flooring and carpets, which had a valid subchapter S election in effect for the years in issue.

Beginning in the fall of 1972, Mr. Feininger began purchasing investments solely in reliance upon the advice of Robert Schwap, who at that time was an associate of Richard Bridges. In 1972, he bought a partnership interest in Petro Search, which was involved in buying small gas companies. He had no expertise in the area of oil and gas ventures. This investment turned out to be a very profitable one for Mr. Feininger. Based on the advice of Mr. Schwap, he also invested in Urban Improvement Co., which was involved in the rehabilitation of apartments. At the time of trial, this investment had not proved to be a profitable one.

In the fall of 1974, Mr. Schwap recommended that Mr. Feininger invest in D. N. Co., a limited partnership which was formed with the intent of purchasing and exploiting a movie. Mr. Schwap explained that it was his opinion that the film, "Dead of Night," would make money. He also stated that this was a high-risk investment but that it did have some tax benefits. Mr. Feininger, on October 21, 1974, signed a subscription agreement for the purchase of one unit amounting to a 4.95-percent interest in the limited partnership for $11,700. He has never viewed the film, "Dead of Night," owned by D. N. Co., and he knew nothing about the motion picture industry.

Prior to his investment in D. N. Co., Mr. Siegel had invested in two apartment projects, one oil-drilling venture, and a raw-land investment. He did not have any expertise in the area of oil and gas ventures or apartments. He was approached in the fall of 1974 by Reese Inge, who at that time was an associate of Richard Bridges, about an investment in a motion picture. After talking with Mr. Inge about 4 or 5 times about motion pictures, he relied on Mr. Inge's advice and on October 23,

1974, signed a subscription agreement for two units amounting to a 9.9-percent interest in the limited partnership, at a cost of $23,400. At the time of his purchase of a limited partnership interest in D. N. Co., Mr. Siegel felt that although highly risky, the investment did have profit potential and favorable tax benefits. Mr. Siegel did not discuss the advisability of an investment in the D. N. Co. partnership with anyone other than Mr. Inge. Mr. Siegel had no expertise in the movie industry and has never viewed the film, "Dead of Night."

The subscription agreement signed by each petitioner stated that by executing the agreement, he would be deemed to have executed the limited partnership agreement dated October 9, 1974. Sometime prior to signing the subscription agreement, each petitioner had received a copy of the Private Placement Memorandum which described the various aspects of the limited partnership, including the purchase and distribution of the film entitled "Dead of Night," and the tax implications for each potential investor. Petitioners also received a document entitled "The D. N. Company Tax Recap for 1 Unit." This document stated that in return for the purchase of one unit at $11,700, an investor could expect to realize, assuming a tax bracket of 53 percent, total tax reductions of $21,513, or a profit, resulting from the tax reduction over 3 years, of $9,813. Petitioners also received a document which described the possible consequences for the purchaser of a one-unit ($11,700) investment, assuming box office proceeds from $1,250,000 to $10 million. In addition to the projection of the net deduction and taxable income at liquidation to a limited partner, the documents stated that, at the following box office amounts, the specified amount of cash would be paid on a nonrecourse note which was given by the partnership as part of the purchase price of the movie: At $2,188,000 of box office proceeds, $56,000 would be paid on the note; at $3,100,000, $111,000 would be paid on the note; at $5 million, $225,000 would be paid on the note; and at $10 million, $525,000 would be paid on the note.

Mr. Bridges has a degree in industrial management from Georgia Tech and has, at one time or another, been licensed in real estate, insurance, and as a securities principal. He was president of, among other companies, FAI Investment Analysts, which was involved generally in the investment planning business. He has personally, or through his companies,

been involved at some time in movie investments, oil and gas investments, land syndications, and the insurance business. In the fall of 1973, he was involved with the films "Klansman" and "Hurry Up or I'll Be 30." Along with "Dead of Night," he was also involved with three other films at that time and has been involved with many others since then. With some of the films, Mr. Bridges would form a limited partnership or some other business entity to purchase the movie, and then sell interests to unrelated investors. With others, the limited partnerships he had formed would be involved in the production of the films, often as part investors along with other companies such as Allied Artists, Gloria Films, and Columbia Pictures. When Mr. Bridges formed a limited partnership, his companies were paid a fee or commission for organizing the investment. In this regard, D. N. Co. paid a 10-percent commission to FAI Investment Analysts with respect to the sale of units in the partnership to investors. The partnership deducted the amount paid, $23,400, as fees in 1974.

The limited partnership agreement of D. N. Co., dated as of October 9, 1974, recites that it is made among the general partner, Richard Bridges, and each additional party who shall at any time become a signatory to the agreement, the latter constituting the limited partners. The agreement provided that—

The business of the Partnership shall be the distribution and exploitation of a feature length 35mm color, motion picture photoplay entitled "Dead of Night" and the exploiting and turning to account the rights held by the Partnership in said motion picture, the underlying script, and any and all ancillary rights with respect thereto.

The agreement included attachments dated through October 24, 1974, which contained the signatures of the limited partners. The agreement provided that the general partner was to contribute $1,000 to the partnership capital for his general partnership interest. The capital contributions of the limited partners were measured in terms of units at a cost of $11,700, each, or a total of $234,000. In fact, 8 limited partners purchased 1 unit, and 6 limited partners purchased 2 units, each, for a total of 14 limited partners. The terms of payment for each unit held by a limited partner were stated in the agreement as follows: $4,500 cash payable upon execution of the agreement, with the balance represented by three notes

bearing interest at the rate of 8 percent per annum in the amounts of $3,000 due December 1, 1974; $2,100 due April 1, 1975; and $2,100 due June 1, 1975. If a limited partner failed to make any payments due, then the general partner could, among other things, cancel the entire partnership interest of the defaulting partner. The net operating cash receipts of the partnership were to be distributed at the discretion of the general partner, 1 percent to the general partner and 99 percent among the limited partners, pro rata in accordance with the number of units held. All items of income, gain, loss, deductions, or credit for any year of the partnership, for Federal income tax purposes, were allocable among the partners in proportion to the distribution of net operating cash receipts made during the year. The general partner had the exclusive right and power to manage and conduct the partnership business and for such services was to receive a management fee equal to 25 percent of the net operating cash receipts after the limited partners had received a sum equal to their investment. The agreement also provided that no limited partner "shall be liable" for any expenses, liabilities, or obligations of the partnership in excess of his contribution to the capital of the partnership. Upon dissolution and termination of the partnership, the agreement provided that after the payments of the partnership's debts and liabilities, the balance remaining would be distributed among the partners, pro rata. The appropriate forms were filed to have the partnership qualified as a limited partnership under New York law.

As of the date of trial of this case, Mr. Feininger had paid $10,000 of the stated price of one unit of $11,700, in the following manner: He paid $7,500 plus $26.40 interest in 1974; $1,000 in 1975; $500 in 1976; and $1,000 in 1978. As of January 28, 1978, Mr. Siegel had paid $20,000 of the price of his two-unit cost of $23,400 as follows: In 1974, he paid $15,000 plus $52.80 interest; $2,000 in 1975; $2,000 in 1976; and he paid $1,000 on January 28, 1978. In payment for his 1-percent partnership interest, Mr. Bridges signed a demand note dated October 1, 1974, in the amount of $1,000 payable to the order of D. N. Co. This note was not paid during the years here in issue. In 1974, a total of $147,000 cash was collected from the limited partners. For the years 1975 and 1976, a total of $23,000 and $10,000, respectively, in cash was collected on the

notes from the limited partners. Thus, out of the total amount of $234,000 which the limited partners were required to contribute to the capital of the partnership, the limited partners had actually paid $180,000 as of the end of 1976.

Mr. David Perlmutter, along with four other people, formed a Canadian company called Quadrant Films, Limited (Quadrant), of which Mr. Perlmutter was president. This company was involved in film production and film financing and has been involved in more than 20 films. The second film in which Quadrant was involved was "Dead of Night," which was made in 1972. The film was owned by a limited partnership, Night Walk Limited & Co., which had as its general partner, Night Walk Ltd. (Night Walk), a wholly owned subsidiary of Quadrant. In the early part of 1974, Mr. Perlmutter was introduced to Howard Effron, who was involved in the film industry and lived in New York City. There was no relationship between Mr. Perlmutter, or any of the companies in which he held interests, and Mr. Effron, or any of the companies in which he held interests. Quadrant, acting on behalf of Night Walk, agreed to sell all of the rights to the movie, "Dead of Night," for distribution and exploitation in the United States, its territories, and possessions to Mr. Effron or his designee. The U.S. rights to a film constitute 50 percent of the entire world market for a motion picture. An agreement dated "July 3, 1974 as of June 30, 1974" was entered into between Night Walk and Maditax, Inc. (Maditax), a New York corporation which was represented by Mr. Effron, providing for the sale to Maditax of the distribution rights in the United States, its territories, and provinces, of the movie, "Dead of Night." The total purchase price agreed to by the parties was $1 million, payable $5,000 on or before June 30, 1974, and a total of $170,000, payable at stated intervals until November 30, 1975. The balance of $825,000 was evidenced by a nonnegotiable nonrecourse promissory note due on or before June 30, 1984. Mr. Perlmutter agreed to the $1 million purchase price, $825,000 of which was evidenced by a nonrecourse note, principally because he approximated that, if the note were paid, his Canadian investors in the film would receive twice as much as they had initially invested. On closing, July 3, 1974, Mr. Effron tendered a check for $5,000 as agreed, but the

check later turned out to be payable on an account with insufficient funds.

After being unable to contact Mr. Effron, Mr. Perlmutter's inquiries led to Mr. Bridges in Atlanta, Ga. Thereafter, Mr. Perlmutter and Mr. Bridges met in New York. There was no relationship between Mr. Perlmutter, or any of the companies in which he held an interest, and Mr. Bridges, or any of the companies in which he held an interest. Mr. Bridges, on behalf of D. N. Co. and Mr. Perlmutter renegotiated the purchase agreement which Night Walk had with Maditax. Under this new agreement dated October 9, 1974, D. N. Co. agreed to the terms stated in the original sales contract, except that the total purchase price was reduced from $1 million to $900,000, payable as follows: (a) $55,000 in cash payable on or before October 31, 1974; (b) $22,500 on or before December 10, 1974; (c) $35,000 on or before April 10, 1975; (d) $35,000 on or before June 10, 1975, with each of the last three amounts represented by recourse notes with D. N. Co. as payor; and the balance of the purchase price, $752,500 represented by a nonnegotiable, nonrecourse promissory note with interest at 6 percent per annum due on or before October 15, 1984, secured only by the film, "Dead of Night." The terms of repayment stated for the nonrecourse note were that, after D. N. Co. had received $165,000 from the film, the seller was entitled to receive 45 percent of the purchaser's "net receipts" from the film as payment on the note. In addition, the purchaser agreed to prepay interest on the note in the amount of $42,500 on or before December 10, 1974. The note stated that it should be governed by New York law and any order to enforce it should be brought only in New York. D. N. Co. made payments of $72,500 on the recourse portion of the purchase price and $42,500 as prepaid interest in 1974. This left an unpaid balance of $75,000 due on the recourse note. Except to the extent of the above-stated changes, the original agreement dated July 3, 1974, was to remain in full force and effect. In an agreement dated October 22, 1974, Maditax agreed to assign all of its rights under the original purchase agreement to D. N. Co.

In the early part of the negotiations for the purchase of the film by D. N. Co., Mr. Perlmutter wrote a letter dated August

16, 1974, to Mr. Bridges which outlined the terms of the prior agreement with Maditax and also stated:

The distributor, Europix International Ltd., have [sic] indicated that the theatrical gross should be at least $2,500,000. Such a gross would result in approximately $800,000 coming back to Europix as distributor. Based on our distribution arrangement with them, they would receive one-third of this, or $265,000 and prints and advertising would be a further cost of $100,000, leaving total proceeds of $435,000 to the producer. Based on the deal as now structured, the American purchasers would receive 50% of these proceeds, or $217,500, which would represent a profit over the cash being paid of $175,000.

D. N. Co. maintained its books and records on the cash basis method of accounting and used this same method for tax purposes. It also used the calendar year for tax and book purposes. D. N. Co. maintained a bank account at the Cobb Bank & Trust Co., Smyrna, Ga., to handle the receipts from the film, "Dead of Night." In a letter dated October 22, 1974, Mr. Bridges directed that the amounts deposited from the film by the distributor, Europix International, Ltd. (Europix), were to be disbursed as follows: the first $165,000 was to be paid to D. N. Co., and, thereafter, 45 percent was payable to Night Walk, with the balance payable to the partnership. However, for the years 1974, 1975, and 1976 here in issue, the partnership did not receive any proceeds resulting from the exploitation of the film from the distributor.

The original sales agreement with Maditax dated July 3, 1974, expressly stated that a distribution agreement had previously been entered into with Europix and that the distribution agreement was to remain in full force and effect. In the distribution agreement dated May 31, 1974, Quadrant granted Europix the distribution rights with respect to all modes of exhibition, except television, for the film, "Dead of Night," for a period of 7 years from the date of the agreement for the territory consisting of the United States, its territories, and possessions. The agreement provided that the gross receipts were to be allocated one-third to the distributor as its distribution fee, one-third retained by the distributor and applied by it to the reimbursement of all exploitation expenses, such payment to be made until the distributor had fully recouped all such expenses, and the balance paid to the producer, Quadrant. With respect to the actual payment of the proceeds to the producer, the contract provided that the

distributor did not guarantee payment by any subdistributor and that the distributor "shall not be liable to Grantor for 'Producer's share' or any other part of 'Gross Receipts' except and only to the extent that Grantor itself shall actually receive payment thereof." The agreement also provided that the distributor had the right to exploit the movie in good faith and in accordance with its sole discretion but that it must spend at least $30,000 in the promotion and advertising of the film. Although no television rights were conferred to Europix, the agreement stated that no television exhibition could take place until 3 years after the first theatrical exhibition. In addition, Europix was entitled to a 10-percent commission on the sale of the television rights to any third party. In an undated letter, Europix was directed by Maditax to make all payments, due the producer under the distribution agreement with Quadrant, directly to D. N. Co.

Under the sales agreement and theatrical distribution agreement, D. N. Co. was entitled to the following: Out of the gross receipts received by the distributor, the partnership received one-third; from this one-third, it received the first $165,000, and thereafter was entitled to 55 percent. Thus, after it received $165,000 cash, the partnership was entitled to approximately one-sixth of the gross receipts. D. N. Co. was also entitled to a percentage of the receipts from television sales, but such sales were not to begin until 3 years after the date of the distribution contract.

The sales agreement dated July 3, 1974, specifically provided that it was subject to a prior agreement with Quadrant with respect to the television distribution rights of the movie. In that agreement dated May 31, 1974, Night Walk and Quadrant Distributing, Ltd. (another company controlled by Mr. Perlmutter), entered into a television distribution contract for which the distributor was to receive a fee of 35 percent of the gross receipts after deduction for the direct expenses of such television distribution. Accordingly, Europix was entitled to 10 percent of the 65 percent received by Night Walk from the television proceeds.

Europix, the theatrical distributor of the film, was a small, independent company formed in 1971. Europix was not related in any way to Mr. Perlmutter or Mr. Bridges. Due to a lack of funds, it filed an assignment for the benefit of creditors in the

State of New York in 1975. Robert Kilgore was the vice president and general sales manager of Europix for a period of about 2½ years from 1973 to 1975 and, overall, his efforts produced a profit for the company. Prior to his association with Europix, Mr. Kilgore had been involved in the movie industry for approximately 35 years as an usher, theater owner, and national distributor. Immediately prior to his association with Europix, Mr. Kilgore had personally directed the entire distribution effort for a number of foreign-made "horror" films. On most of these films, he had completely reorganized the entire distribution campaigns, with the result that many of the films returned a substantial profit over the amount invested.

At the time Mr. Kilgore joined Europix, the company did not have a distribution agreement for "Dead of Night." After Mr. Kilgore joined the company, Bob Clark, who was a close personal friend of his and the producer of the film, encouraged Mr. Perlmutter to agree to permit Europix, and specifically, Mr. Kilgore, to distribute the picture.

Mr. Perlmutter agreed to this arrangement for two reasons: first, Europix had previously done a good job distributing "Children Shouldn't Play With Dead Things," which was Mr. Clark's first directorial effort; and second, Mr. Kilgore was very enthusiastic about the prospects of the film, "Dead of Night." Mr. Kilgore first screened the picture in late 1973 before the distribution rights were acquired by Europix. He felt that the film was entertaining and the shock punches in it were well placed. Overall, it was his opinion that this particular picture had real box office potential and it was his projection in the beginning that this picture would gross $5 million at the box office.

Under Mr. Kilgore's direction, the film opened at its world premiere on August 29, 1974, at the Britton Cinema III in Tampa, Fla. This location was selected because the picture was made in Brooksville, Fla., which is about 40 miles away. For this reason, the picture received a lot of free publicity in the form of press coverage. In conjunction with the opening, John Marley, the star of "Dead of Night," made numerous personal appearances including interviews on television, radio, and for the newspapers. The actual premiere included searchlights

and ribbon-cutting. This premiere cost Europix a total of about $20,000 cash.

Mr. Kilgore regarded the premiere as very successful since the movie was held over in every theater a second week and in some of the theaters was even held over a third and fourth week. Initially, Mr. Kilgore had purchased 25 prints of the film to begin distribution. The allocation of money spent on distribution for such items as advertising versus the amount spent on prints is entirely a matter of discretion on the part of the distributor. Based on the premiere in Florida, Mr. Kilgore's distributor in that area estimated that he would need another 50 prints just to handle the distribution in that area. After the additional 50 prints were ordered, the bookings for the film kept expanding. Since Mr. Kilgore felt that the picture was "taking off," he ordered an additional 25 prints, for a total of 100 prints. He realized later that it was a mistake to buy more than 25 prints before it had been determined how well the picture would actually do. This proved to be a critical mistake in the distribution of this movie by Europix, because, of the total amount of approximately $130,000 spent on distribution, the cost of 100 prints, at $800 each, equaled an advance cash outlay of $80,000. After other expenses, Europix spent only about $22,000 on advertising and $20,000 cash on the world premiere in Tampa. In addition to the other expenses incurred, Mr. Kilgore spent approximately $4,000 on 10 screenings set up at various cities across the country, for buyers and bookers of films, prior to the world premiere in an effort to generate interest in the film on the part of those who schedule films for their respective theaters. Mr. Kilgore felt that he received a positive reaction at these showings of the film all across the country and that all indicators pointed to a successful film. This was another factor which encouraged him to purchase 100 prints.

After the movie opened in Florida, it was shown next in the Atlanta-Jacksonville exchange areas. The box office gross receipts from the premiere and from the subsequent showings for the period extending from late August through the month of September 1974 were about $110,000 to $115,000. In a 2-week timespan during this period, the film had about 80 bookings. In spite of Mr. Kilgore's initial optimistic feelings, this was, in fact, only a fair box office performance. However,

in October 1974, Mr. Kilgore still had the utmost faith that the film would be successful.

Mr. Bridges purchased the movie in early October 1974 after the film had made its premiere. He considered the following factors in deciding to complete the purchases: First, he liked the fact that a distribution agreement was already in effect and that Europix was prepared to spend $100,000 of its money to distribute the film. Second, he had met Mr. Kilgore before purchasing the film, and he was impressed with his background and experience in distributing films and his dedication to, and enthusiasm for, this particular film. Third, he thought the picture was well done, and it had two actors who had been nominated for academy awards. Finally, it was represented to Mr. Bridges that the results of the test marketing of the film appeared to be strong, that the reviews from two Florida newspapers that he read were favorable, and that Mr. Kilgore had recently "trade-screened" the film in 10 major cities to different exhibitors and had stated that their response was very positive.

The producer's report dated December 31, 1974, states that the cumulative share due D. N. Co. after deduction for the one-third distribution fee and the distributor's retention of one-third for recoupment of expenses was $3,478.94. During this time, the film produced approximately $200,000 in box office receipts. The final producer's report issued by Europix dated May 31, 1975, stated that the producer's share due D. N. Co. was a cumulative total of $6,085.98. By December 1974, Europix had stopped making play dates for the film in 1975.

In the fall of 1974, Europix began experiencing financial difficulties. One of the company's principal problems was that many of the subdistributors for the movies handled by Europix knew that it was having problems and were simply not forwarding the agreed amounts of film rentals due to Europix. D. N. Co. did not receive any of the amounts reflected in the producer's report due it from Europix. Although Europix did collect some of the film rentals, it never turned any of the money over to D. N. Co. In a letter dated December 15, 1974, Mr. Perlmutter, on behalf of Quadrant, notified Europix that it was deemed to be in default of the distribution agreement, and in a letter dated March 5, 1975, Mr. Perlmutter wrote that as 60 days had passed, the original distribution agreement was

officially considered null and void. Sometime in early 1975, Europix filed an assignment for the benefit of creditors in the State of New York.

In a letter dated March 17, 1976, on behalf of D. N. Co., addressed to Stuart D. Harnell, one of the prime subdistributors of the film under Europix, an attorney stated that D. N. Co. was entitled to receive its one-third share of the approximately $20,000 which the film earned during 1974 and requested that Mr. Harnell promptly remit the amount due. No payment was made to D. N. Co. by this subdistributor or any other which owed money to the partnership.

In early 1975, Mr. Kilgore left Europix and joined a firm called S & H Entertainment, Inc. (S & H), located in Los Angeles, Calif. About 4 months after Europix filed for an assignment for the benefit of creditors, S & H obtained the distribution rights for the film, "Dead of Night." This agreement was made as of May 5, 1975. During this 4-month period, the film was not distributed since the prints were locked in a vault due to the financial problems of Europix.

Mr. Kilgore remained with S & H for about a year, during which time he continued his efforts in the distribution of the film, "Dead of Night." During the entire period of distribution, neither Mr. Bridges nor the owner of S & H interfered in the manner in which Mr. Kilgore was distributing the movie, nor did they try to alter his course of action. They did not interfere because they knew that Mr. Kilgore was attempting to exploit the movie in the best manner to make it successful. Neither Mr. Bridges nor the owner of S & H claimed to be an expert in film distribution, and they both, accordingly, depended entirely on Mr. Kilgore's judgment. However, they often discussed the film and the distribution efforts with Mr. Kilgore, and he supplied them with the appropriate information and sent them periodic reports.

From the beginning, Mr. Bridges wrote a significant number of letters to the limited partners in an effort to keep them informed at all times on matters ranging from distribution reports to changes in the overall marketing strategy for the film. For example, in a letter sent to Mr. Siegel dated August 15, 1975, on stationery of Investment Analysts Inc., Mr. Bridges wrote the following with respect to the past performance of the film and the prospects for the future with S & H:

The Limited Partners
The D. N. Company
Dear Investor,

The purpose of this letter is to bring you up to date on our picture, "Dead of Night".

As you know, we purchased the picture shortly before it had its first opening in the Tampa, Florida area in which it did quite well at the box office. Play dates were then scheduled throughout parts of the southeast. Our purchase was subject to an existing distribution agreement with Europix International out of New York.

Since then a great deal has transpired, namely that Europix has gone into bankruptcy as result of sub-distributors failing to make timely payments and certain other circumstances that happened to Europix. During this period of time, we have been in continuous negotiations with Technicolor and National Film Service, companies which provided substantial services on "Dead of Night" on behalf of Europix, and had certain liens through prints, negatives, etc.

We are very pleased to announce that we have successfully concluded our negotiations with Technicolor and National Film Services where Technicolor has agreed to release all rights for 10% of the distributor's gross as result of the manufacturing of prints on said picture. This is extremely favorable as it means we pay for prints out of 10% of gross income while we have full use of said prints.

Entertainment International, of Los Angeles and New York, is very excited about the picture and in the process of redoing the entire ad campaign, retitling the picture from "Dead of Night" to "The Night Andy Came Home", redoing the T.V. spots and, in general, making certain modifications to improve, in their opinion, audience response to the picture. By changing the name of the picture, we will be able to go back into the same territories that the picture has previously played, which represents only approximately 15% of the nation, in addition to the rest of the 85% which it has not played in. Our new distributors feel that with a new ad campaign, new trailers (T.V. spots, etc.) we can have a hard hitting campaign for our new release.

As I am sure you are aware, you have not been billed for the April nor the June payments of $2,100 per unit as originally was intended. The reason, of course, is that I had refused to send out billings until we had this picture straightened out and back in distribution.

This simply means that you will continue to enjoy the tax benefits that took place in 1974 as well as 1975 and subsequent years, but your last two investments will be delayed in your favor with the exception of $1,000.00 per unit, which I am asking you to send now and is needed to defer costs of certain materials which we must have, namely a new trailer, T.V. spots and certain hard copy materials. These dollars will be recouped, for the most part, out of first revenues from the distributor. Please make your check payable to The D. N. Company and forward in the enclosed envelope.

We expect to have many play dates set for the United States over the coming months. If you have any questions, etc., please don't hesitate to call me or your representative from FAI.

Sincerely,

THE D. N. COMPANY

(S) Richard F. Bridges

RICHARD F. BRIDGES

*General Partner*

jac

Enclosure

P.S. Since you own two units, please write your check in the amount of $2,000.00.

In the spring of 1976, Mr. Bridges bought S & H and renamed the company "Entertainment International Pictures" (Entertainment) and put Mr. Kilgore in charge. At this time, the pictures that were distributed by Entertainment were, except for one, either owned by Mr. Bridges or were pictures with which Mr. Bridges was involved. It was at this point in time that Mr. Kilgore and Mr. Bridges discussed the future of the film, "Dead of Night," and Mr. Bridges suggested that they should make plans for a new campaign including a title change. Mr. Kilgore still felt that the picture had potential and that, if the right combination of factors were present, the picture could make money. Entertainment was located in Los Angeles, Calif., and remained there until the operations were moved to Atlanta, Ga., in November 1977. Mr. Kilgore remained with the company until the move and then became associated, as general sales manager, with another film distribution company called Group One Films, in Los Angeles, where he was employed at the time of trial. Overall, after Europix distributed the film, Mr. Kilgore organized two completely new advertising and distribution campaigns for the film in an effort to make the film successful.

As of early 1976, D. N. Co. still owed Night Walk for the recourse portion of the purchase price of the film. In a letter dated March 12, 1976, Mr. Perlmutter stated that he was aware that arrangements had been completed for the release of the film under a new title and for a new campaign in April 1976. He also stated that he would like to know what plans were being made for the payment of the $75,000 balance of the purchase price. Prior to this time, Mr. Perlmutter and Mr. Bridges had agreed to postpone collection on the balance of the

purchase price until such time as D. N. Co. had obtained a new distributor. Mr. Perlmutter made this concession because he felt that he had an obligation to do so, since the distributor, Europix, had gone bankrupt.

In a letter dated March 24, 1976, to Mr. Perlmutter, Mr. Bridges wrote as follows:

I have acquired Entertainment International Pictures and Bob Kilgore will be heading up this company as before.

I acquired the company for two reasons. One is, I wanted to get into the distribution business and secondly, they were handling "Death Dream" along with several other pictures of ours and I was concerned about their financial ability to properly distribute and promote these pictures. "Death Dream" is very close to being ready for release and Kilgore feels like the picture has a very good potential.

EFX has billed me for approximately $2,600 for the Trailer, copy of invoices enclosed. In addition to this bill, of course, there are others which I will be sending you copies of amounting to a few thousand dollars.

David, I would like your agreement that we use part of the monies due on the balance due Night Walk Ltd. in order to get this picture in effective distribution within the very near future. As we both know, neither of us are benefiting from its present status. I will work something out with you as to the repayment of these dollars that have been advanced out of film rentals.

I need to write my investors as to the game plan mentioned above so please signify your agreement to this course of action either by telephone or by letter as quickly as possible.

[Reproduced literally.]

In response to Mr. Bridges' letter and a subsequent telephone conversation, Mr. Perlmutter wrote a letter dated April 1, 1976, which proposed that, of the $75,000, $25,000 could be used for current distribution expenses if Mr. Bridges would agree to a revised repayment schedule.

Although he did not reply directly to the terms of Mr. Perlmutter's proposed agreement, Mr. Bridges did reply, in a letter to Mr. Perlmutter dated July 22, 1977, as follows:

Bob is double billing "Deathdream" with one of our other pictures and we had our first test date in Bakersfield, California about two weeks ago. With very little money spent for advertising, we had a very respectable gross and Bob feels, with the double bill, we will get a good bit of play late summer and fall.

David, as soon as Bob actually has play dates and these play dates become a reality, so that I can say to our investors we finally do have the picture in *distribution,* then I will bill our investors for the money owed you. I appreciate your patience in this matter.

In a letter dated October 11, 1977, to Mr. Bridges, Mr. Perlmutter stated that the balance of $75,000 was still owing

on the original purchase of the film. He then proposed a new arrangement for the payment of the balance due and a plan whereby Quadrant would relinquish its rights to handle the television sales for the film in return for a stated amount. Despite these efforts, the $75,000 balance remained unpaid. Thereafter, an attorney representing Night Walk, in an effort to collect the balance due on the original sales price of the movie, wrote a letter to the limited partners of D. N. Co., in late 1979 or early 1980, requesting that they pay their full capital contribution to the partnership. At the time of trial, this matter had not been resolved and there have been no payments on the $75,000 balance.

The television rights to the film, now called "Deathdream," were not exploited until the fall of 1977. On September 1, 1977, D. N. Co. and Ben Barry & Associates, Inc. (Ben Barry), a television syndication company, entered into a distribution agreement involving the television exhibition of the film. The agreement was to continue for a period of 15 years. For its services, Ben Barry was entitled to a fee of 35 percent of the proceeds from television and other media sales. Mr. Bridges subsequently persuaded Ben Barry to agree to reduce the percentage to 30 percent.

At this time, D. N. Co. owed Technicolor $65,623.11 for laboratory and printing services performed in connection with the film, "Dead of Night." When the television contract with Ben Barry was concluded, D. N. Co. and Entertainment then entered into an agreement dated September 8, 1977, entitled "Memorandum of Agreement—Settlement Between Parties," in which they agreed to assign to Technicolor all of their right, title, and interest in the proceeds from the television syndication of the film, "Deathdream," in the cities of Los Angeles and New York. The New York and Los Angeles television markets are regarded as comprising 50 percent of the total television market in the United States. In return, Technicolor agreed to cancel its $65,623.11 debt. In an agreement dated November 6, 1975, D. N. Co. had previously agreed to relieve Europix and to assume responsibility for the debt which would then be paid from a portion of the proceeds from the film. The partnership had done this because Technicolor had threatened at that time to stop all distribution and foreclose on the film. None of these television agreements mentioned any rights which might be held by Quadrant Distributing Ltd., nor did

Mr. Perlmutter make any claim in subsequent correspondence on behalf of that company. In a letter to the limited partners dated October 19, 1977, Mr. Bridges stated that a television distribution agreement had been consummated with Ben Barry.

After obtaining the television distribution rights, Ben Barry put the movie, "Deathdream," into a package of films for sale to various television stations. The distribution agreement specifically provided that Ben Barry was to recover its cost of distributing the film, first, and thereafter was entitled to 30 percent as its distribution fee. Mr. Bridges closely reviewed all of the subsequent producer's statements and, in a letter to Ben Barry dated July 10, 1978, wrote as follows:

In reviewing the nine producer's statements you have sent us, I have the following questions and comments.

On producer's statement #1, you have shown a deduction of 35% whereby our agreement was to be 30%. I would appreciate your making an adjustment and reflecting this on the next statement.

I have also noticed that, with the exception of the Armed Forces deal, since September 1977 you have collected a total of $970.79 on seven contracts, many of which have been outstanding since the September statement. I noticed, for example, that Station KOAA-TV contracted for $300.00 which first showed upon the February statement. To date, you show collections of $70.56.

To date, I have not received the contracts on the last three deals you made, KOAA, WPHL and WEVU. Please have these contracts forwarded to me as soon as possible.

Ben, I am somewhat concerned about your allocation of the proceeds from these license agreements. For example, I have noticed you have allocated on an equal basis, at least as far as "Deathdream" is concerned, with the exception of the Atlanta territory which should have been $1,031.82. I feel there have been some improper allocations as "Deathdream" certainly is a more commercial film than many of the ones you have on the list, especially the ones in black and white.

I notice that all of the agreements call for booking fees. I would appreciate knowing the amount of booking fees paid on the contracts to date and to whom these payments were made.

I am also concerned about the fact that including Los Angeles and New York there have only been ten sales made in the nine months your report period covers. I would like to know what your estimate for the next twelve months might be in terms of sales.

Ben, before we proceed with any other picture, such as "Hurry Up Or I'll Be 30" as well as a number of other pictures we think would be suitable for

syndication, I would like to have you comment on my questions at your earliest convenience.

Sincerely,
Richard F. Bridges
*General Partner*

In his reply dated July 14, 1978, Ben Barry answered all of the questions raised and also stated that the partnership should realize a minimum of $50,000 in the next 12 months from the entire U.S. television market.

The partnership received its first distribution check in the amount of $214.65 as its share of the television proceeds in early June 1979. In a letter to the limited partners dated June 19, 1979, Mr. Bridges stated that this check, along with all subsequent checks, would be retained by the partnership to pay the costs of the audit by the Internal Revenue Service and any subsequent litigation involving the partnership. In a report dated July 31, 1979, statement number 23 from Ben Barry reported that the total television sales amounted to $9,767.72 of which $6,356.45 had been paid to date. At some point during 1980, Ben Barry sold his company's interest in the film to Gold Key Entertainment of Hollywood, Calif. (Gold Key). Mr. Bridges believed that Mr. Barry kept the business he had, and Gold Key purchased only the future contract rights with respect to the film since Mr. Bridges received statements and checks from both entities. Gold Key is a larger television syndication company which, Mr. Bridges was told, could do a much better job of marketing the picture. In producer's report number 5 from Gold Key, which was cumulative to April 26, 1980, the gross receipts were $1,863.24. At the time of trial, D. N. Co. had not received any payments from Gold Key.

"Dead of Night" is a low-budget "horror" film involving a young soldier, Andy, who is killed in combat, in an area that reminds the viewer of Vietnam, and returns home to a small town as a "zombie." Acting very strange and detached, Andy proceeds to kill a truck driver, a neighborhood dog, the family doctor, whom he stabs repeatedly with a big hypodermic needle, and an old girlfriend, whom he kills at a drive-in theater. The film ends with Andy's climbing into a hole in a cemetery where he expires beneath his own predated headstone. The film's stars are John Marley and Lynn Carlin, both of whom have received academy award nominations. The two other principal actors are Richard Backus and Henderson

Forsyth. The copyrighted film was shot in 35mm and was 90 minutes in length. It had a PG rating because the intended market was for viewers in the 15- to 20-year age group. The film was produced and directed by Bob Clark. Mr. Clark's only other directorial effort at that time was a film which was completed just before "Dead of Night" entitled "Children Shouldn't Play With Dead Things." The executive producers were John Trent and Peter James. There were no obvious technical problems with the film. When the film's title was subsequently changed to "Deathdream," the advertising slick stated that "it wrings the victims out * * * and hangs them up to die!!!" Prior to the completion of the film, it was referred to as "The Veteran," "The Night Walk," and "When Andy Comes Home," in that order. After the film entered distribution, it was entitled "Dead of Night" and "Deathdream," in that order.

The financing for the production of the film was arranged by Mr. Perlmutter in Canada. Specifically, the funding was arranged through a limited partnership, Night Walk, whose general partner was a wholly owned subsidiary of Quadrant, an Ontario, Canada, corporation. "Dead of Night" was the second film financed through this group, the first being "The Neptune Factor," in 1972. Since that time, Quadrant and the various controlled companies have been involved with the financing and/or production of 20 feature films. With the original budget for the film projected at $200,000, Mr. Perlmutter arranged for an Englishman to invest $100,000 cash, and 10 Canadians, through the limited partnership, to invest $10,000, each. As the shooting of the film progressed, the original budget increased, and Mr. Perlmutter arranged for additional funds through investment by two other sources in England, of about $70,000 to $80,000, with Quadrant's providing the balance of the financing from its own resources. The cash production costs incurred by Night Walk for the film totaled $397,289.

The film was shot in Brooksville, Fla., with an American cast. The principal photography began November 6, 1972, and was completed on December 19, 1972. The postproduction period, in which the film is edited, the music track is added, and the sound effects are put in, which normally takes a minimum of 12 weeks, involved some differences of opinion between the principals. Although the work began in Toronto,

Canada, in January 1973, it was not completed until December 7, 1973. Negotiations were begun in late 1973 for the distribution of the film, but due to the slow development of the negotiations and the time required by Europix, once an agreement was reached, to establish the release dates and the campaign design and advertising, etc., the film was not released until late August 1974.

On its initial U.S. Partnership Return of Income form for its taxable year beginning October 1, 1974, and ending December 31, 1974, D. N. Co. claimed a depreciable basis for the film "Dead of Night" of $900,000. The partnership reported the following amounts of income and deductions for the stated years:

|  | 1974 | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| INCOME: |  |  |  |  |  |
| Gross profit | $6,958 | $5,465 | $1,172 | $804 | $116 |
| Interest income | 471 | --- | 459 | --- | 63 |
| Less: |  |  |  |  |  |
| Interest | 42,500 | --- | --- | --- | --- |
| Depreciation | 136,125 | 220,001 | 289,820 | 38,184 | 45,838 |
| Other deductions | [1] 32,154 | [2] 20,636 | [3] 22,844 | [3] 4,157 | [3] 3,409 |
| INCOME (LOSS) | (203,350) | (235,172) | (311,033) | (41,537) | (49,068) |

[1] Commissions, $23,400; legal, $4,650; distribution expenses, $3,479; travel, $576; miscellaneous, $49.

[2] Legal and accounting, $4,704; administrative expenses, $731; trailer costs, $5,918; print costs, $5,465; distribution expenses, $3,479; travel, $339.

[3] These deductions included expenditures for, among other things, legal and accounting, administrative expenses, trailer costs, print costs, distribution expenses, storage and shipping, and travel.

The partnership computed the allowable depreciation each year under the income-forecast method authorized for motion pictures under Rev. Rul. 60–358, 1960–2 C.B. 68. In a letter dated March 7, 1975, Mr. Bridges estimated that, as of the end of the taxable year 1974, the movie would produce total income of $42,000 over its useful life. In arriving at the amount of income actually produced by the movie for 1974, the accountant who prepared the partnership's return added the figures appearing in the distributor's (Europix) reports number 3 and 4 for a total of $6,957.88. This figure represented the net balance of film rental after deducting the one-third distribution fee, but not deducting the one-third to which the distributor was entitled to apply to recoupable expenses. The amount shown on the report as the "Producer's Share," which

was the amount actually due D. N. Co., was \$3,478.94. Based on the accountant's figures, the fraction of actual income over total estimated income equaled 16.5 percent (\$6,958 over \$42,000). After deducting additional first-year depreciation of \$30,000 and 5 percent of the cost of the film or \$45,000 as salvage value, the balance to be depreciated in 1974 was \$825,000. The partnership then claimed 16.5 percent of the depreciation basis of the movie or \$136,125 as depreciation in 1974. The depreciation for the next 4 years was determined according to the following formula:

$$\frac{\text{Total income to date}}{\text{Revised estimated income}} \times \text{Total basis} = \text{Total depreciation}$$

$$\text{Total depreciation} - \text{Prior claimed depreciation} = \text{Year's depreciation deduction}$$

After the taxable year 1974, the estimated salvage value was reduced from \$45,000 to \$10,000, thus increasing the depreciable basis from \$825,000 to \$860,000. The actual computations as reported on the returns were as follows:

1975 $\frac{12,423}{30,000} \times 860,000 = 356,126 - 136,125 = 220,001$—Depreciation expense

1976 $\frac{13,595}{18,100} \times 860,00 = 645,946 - 356,126 = 289,820$—Depreciation expense

1977 $\frac{14,399}{18,100} \times 860,000 = 684,130 - 645,946 = 38,184$—Depreciation expense

1978 $\frac{14,515}{17,100} \times 860,000 = 729,968 - 684,130 = 45,838$—Depreciation expense

D. N. Co. paid commissions to Mr. Bridges' company, FAI Investment Analysts, for its part in the sale of the partnership units to prospective investors. The partnership deducted the fees in the amount of \$23,400, in 1974. The partnership made payments to the law firm of Burns, Van Kirk, Greene & Kafer and the law firm of Wofsey, Certilman, Haft, Snow & Becker for legal fees and payments to an accounting firm, Henry Warner & Co., of New York. The partnership deducted these respective legal and accounting fees in the total amounts of \$4,650 in 1974, \$4,704 in 1975, and \$2,000 in 1976. Although the partnership deducted distribution expenses in the amounts

of $3,479 in 1974 and $3,479 in 1975, in fact, these distribution expenses were all paid by the distributor.

With the exception of the prepaid interest in 1974 of $42,500, there have been no payments by the partnership on the $752,500 nonrecourse note incurred in the purchase of the film. In addition, D. N. Co. has not made any cash distributions to the limited partners.

On his return for the calendar year 1974, Mr. Siegel claimed that his investment in D. N. Co. was $89,100 and that the property was "new," with a useful life of 7-plus years. On this basis, Mr. Siegel claimed the full 7-percent investment tax credit and a loss of $20,132 plus additional first-year depreciation of $2,000 which was separately stated on his Schedule K–1. Although Mr. Siegel's share of the partnership's prepaid interest expense was separately stated on his Schedule K–1, it was not separately deducted as an interest expense on his 1974 return since it had been included as a partnership deduction in computing the partnership loss. On his return for the calendar year 1975, Mr. Siegel claimed a loss from D. N. Co. of $23,282. Similarly, he claimed a loss of $29,117 for the calendar year 1976.

On his return for the calendar year 1974, Mr. Feininger claimed that his adjusted basis in D. N. Co. was $44,550 and that the property was "new" with a useful life of 7-plus years. On this basis, Mr. Feininger claimed the full 7-percent investment tax credit and reported a loss from the partnership of $10,066 plus additional first-year depreciation of $2,000 which was separately stated. Mr. Feininger did not separately deduct, on his 1974 return, his claimed share of prepaid interest expense as this item had been deducted by the partnership in computing its loss for 1974. On his return for the calendar year 1975, Mr. Feininger claimed a loss from D. N. Co. of $11,641. Similarly, he claimed a loss of $15,396 for the calendar year 1976.

In each of the notices of deficiency, respondent determined that petitioners' claimed deductions of partnership losses for the calendar years 1974, 1975, and 1976 were not allowable for the following reasons: (1)(a) The claimed depreciation deductions were not allowable to the extent they were attributable to the increase in basis due to the nonrecourse debt because that debt lacked economic substance; (b) the balance of the

depreciation deductions were not allowable for the years in issue because, during those years, the partnership did not have any income which was actually received, causing the application of the income-forecast method of depreciation to result in a zero deduction; (c) in any event, the basis of the motion picture for depreciation purposes was limited to $30,000, its fair market value at the date of its acquisition;[1] (2) the claimed interest deduction in the amount of $42,500 was not allowable because the nonrecourse debt incurred in the purchase of the film, "Dead of Night," lacked economic substance; (3) the claimed deductions for distribution expenses of $3,479 in 1974 and $3,479 in 1975 were not allowable since it had not been established that those amounts were ordinary and necessary business expenses; (4) the claimed expenses for legal fees of $4,650 in 1974 and legal and accounting fees of $4,704 in 1975 were not deductible since it had not been established that those amounts constituted ordinary and necessary business expenses rather than capital expenditures;[2] (5) the deduction claimed as an expense for commissions and consulting fees in the amount of $23,400 in 1974 was not allowable since it had not been established that those amounts constituted ordinary and necessary business expenses rather than capital expenditures; (6) the entire claimed partnership loss deductions for the taxable years 1974, 1975, and 1976 were not allowable because it had not been established that the film was used in carrying on a trade or business within the meaning of section 162[3] or that the film was held for the production of income within the meaning of section 212. In this regard, respondent also stated the following:

It further is determined that the acquisition of the film "Dead of Night" was an activity not engaged in for profit within the meaning of section 183 of the Code and that the entire losses claimed by the partnership for 1974, 1975 and 1976 are therefore disallowed.

Finally, respondent determined that the claimed investment

---

[1]On brief, respondent concedes that the fair market value of the television and theatrical rights to the film was not in excess of $59,625.

[2]Respondent stipulated at trial that the partnership is entitled to a deduction of $800 in 1975 for legal and accounting expenses.

[3]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

tax credit attributable to the purchase of the film was not allowable because the film was not new "section 38" property at the date of its acquisition by the partnership and that even if the film were qualified property for investment tax credit purposes, the basis of the property used in the computation must be limited to $30,000, the fair market value of the film at the date of its acquisition.

OPINION

The issues in this case all concern the deductions and credits, if any, to which each petitioner is entitled from his interest in the D. N. Co. partnership. In order to resolve these issues, each particular item of deduction or credit claimed by the D. N. Co. partnership on its return of income for each of the years here in issue must be separately considered.

At the outset, we must determine whether the nonrecourse debt in the amount of $752,500 is properly includable in the basis of the movie purchased by the partnership, since this determination not only has a bearing on the amount of the depreciation deduction, if any, but also on the deductibility of the prepaid interest. It is generally accepted that where property is acquired by purchase, its cost includes the amount of liabilities assumed, or taken subject to, by the purchaser. *Crane v. Commissioner*, 331 U.S. 1 (1947); *Parker v. Delaney*, 186 F.2d 455 (1st Cir. 1950); *Blackstone Theater Co. v. Commissioner*, 12 T.C. 801, 804 (1949). The mere fact that the liability is secured only by the asset transferred and the purchaser otherwise has no personal liability will not, in and of itself, prevent such liability from being included in the basis of the property. *Mayerson v. Commissioner*, 47 T.C. 340 (1966).

However, it is well settled that depreciation is based, not on mere legal title, but on actual investment in the property. *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), affd. per curiam (9th Cir., Mar. 3, 1982); *Mayerson v. Commissioner, supra* at 350. In *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), we stated:

No such actual investment will exist to the extent of the amount of the nonrecourse note where the stated purchase price of the property securing the note exceeds a reasonable estimate of its existing fair market value since the purchaser would be acquiring no equity in the property by making

payments and therefore would have no economic incentive to pay off the note. * * * [Fn. ref. omitted.]

See *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hager v. Commissioner*, 76 T.C. 759, 774–775 (1981); cf. *Beck v. Commissioner*, 74 T.C. 1534, 1562 (1980), on appeal (9th Cir., Jan. 22, 1981). Similarly, in order for interest to be deductible under section 163(a), it must be paid on genuine indebtedness. *Knetsch v. United States*, 364 U.S. 361 (1960); *Derr v. Commissioner*, 77 T.C. 708, 730 (1981); *Hager v. Commissioner, supra* at 773; *Narver v. Commissioner, supra* at 98; *Beck v. Commissioner, supra* at 1552.

We recently discussed this precise issue in connection with a motion picture in *Brannen v. Commissioner, supra*. Without repeating that entire discussion herein, we relied on *Estate of Franklin* and *Narver* and concluded that where respondent challenges the taxpayer's inclusion of a nonrecourse debt in basis, it is incumbent upon petitioner "to establish that the fair market value of the movie reasonably approximated its purchase price," in order for him to prevail. *Brannen v. Commissioner, supra* at 494–495.

At trial, petitioner presented one expert witness who testified that he was not aware of any way to accurately estimate the gross box office of a motion picture before the film has been exhibited. Accordingly, it was his opinion that the fair market value of a film is not ascertainable prior to full exhibition. On brief, petitioners make two arguments: First, they contend that our decision in *Brountas v. Commissioner*, 73 T.C. 491 (1979), on appeal (1st & 3d Cirs., Nov. 23, 1981), stands for the proposition that a nonrecourse debt secured only by the property acquired is to be fully included in the basis of the property without any inquiry into the fair market value of the property; and second, motion pictures are unique assets which cannot be valued.

The taxpayer in *Brannen* made these same arguments. We stated that the *Brountas* case must not be read as expounding a broad new rule of law which exists outside of the particular facts presented in that case. After a discussion of the limited scope of the *Brountas* case, we stated that:

As we are presented herein with a nonrecourse note secured only by a movie, and not a production payment carved out of mineral property, we would have to conclude that a valid debt exists in order to include the

amount thereof in the basis of the property for the purpose of computing depreciation. In order to determine whether a valid debt exists, it is necessary to decide whether the fair market value of the movie reasonably approximated its purchase price. * * * [*Brannen v. Commissioner*, 78 T.C. 471 at 496–497. Fn. ref. omitted.]

Accordingly, since the deficiency notice in the instant case stated that the fair market value of the movie, the only property securing the nonrecourse debt, was disputed by respondent, such issue is properly before us herein, and, in this regard, the burden of proof is upon petitioners. *Welch v. Helvering*, 290 U.S. 111 (1933).

Based on all of the evidence presented, we conclude that petitioners have not sustained their burden of establishing that the fair market value of the movie, "Dead of Night," was equal to, or reasonably approximated, its purchase price. However, this does not mean that we will accept respondent's amended valuation of $59,625, which was the highest value placed on the theatrical and television rights of the film as determined by the five expert witnesses presented by respondent at trial. Rather, after balancing the entire testimony presented by the experts and the other relevant witnesses, we conclude that the value of the movie, "Dead of Night," at the time it was acquired in 1974 by D. N. Co., was $190,000.

An important factor in our determination of the value of the film is that Mr. Perlmutter, the owner of the film, and Mr. Bridges, the general partner of D. N. Co., agreed in negotiation that the cash and recourse note portion of the purchase price would total $190,000, payable as follows: (a) $55,000 payable in cash on or before October 31, 1974; (b) three recourse notes, with D. N. Co. as payor, in the total amount of $92,500;[4] and (c) an additional cash payment, in the form of "prepaid interest" on the nonrecourse note, in the amount of $42,500, which was,

---

[4]We recognize that $75,000 of the total amount of the recourse notes of $92,500 had not been paid by D. N. Co. at the time of trial. Nonetheless, respondent has made no argument that the partnership was not fully liable for the balance due and, in fact, attorneys representing Mr. Perlmutter had made at least one attempt to collect on the notes. See, e.g., *Lemmen v. Commissioner*, 77 T.C. 1326 (1981).

in fact, paid according to the stated terms on or before December 10, 1974.[5] Where there is evidence that the parties have adverse economic interests and have dealt at arm's length, such evidence has been viewed as providing the most reliable basis for a determination of the fair market value of property.[6] *Elmhurst Cemetery v. Commissioner*, 300 U.S. 37, 39 (1937); *Narver v. Commissioner, supra* at 97; *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–244 (1968), affd. 406 F.2d 288 (2d Cir. 1969).

A value of $190,000 is supported by the testimony of Mr. Perlmutter with respect to the costs of production of the film. Mr. Perlmutter testified that the total cash production cost incurred by Night Walk for the film was $397,289. He also stated, in effect, that he would consider a film a success if he could recover the cash production cost of a film and that it was his opinion that the film was worth approximately $400,000. Using the production cost as a measure of value would result in a value of approximately $200,000 for this film, since D. N. Co. purchased only the U.S. rights to the film, which are accepted as representing 50 percent of the world market.

A value of $190,000 is also supported by the terms of the prior agreement between Mr. Perlmutter and Mr. Effron, who acted on behalf of Maditax. In that agreement, the total purchase price was stated to be $1 million, with a total of $175,000 to be paid in cash. When that agreement with Maditax fell through, Mr. Bridges subsequently renegotiated the agreement which resulted in the total purchase price's being reduced from $1 million to $900,000, but the cash portion, which was made up of payments of principal and prepaid interest, was increased from $175,000 to $190,000. Thus, the prior negotiations between Mr. Perlmutter and Mr. Effron with respect to the sale of this film lend credence to a

---

[5]While the parties characterized this cash payment as "prepaid interest," in view of our decision herein that the nonrecourse note was not a genuine indebtedness, we have recharacterized it as an additional payment of principal for the movie.

[6]We note that petitioners' own expert stated that he would not have paid $900,000 cash for this film. Mr. Effron, the original purchaser of the film, also testified that he would not have paid all cash for this film and that, at the very most, he would have paid double the actual amount of cash called for in his contract with Mr. Perlmutter ($145,000) or approximately $300,000. We note that, in fact, the contract called for a total cash payment of $175,000.

conclusion that the fair market value of the film at the time of its purchase by D. N. Co. was $190,000.

While we have considered the amount of cash to be paid for the movie, which amount was arrived at in negotiations between Mr. Perlmutter and Maditax and Mr. Perlmutter and Mr. Bridges, to be indicative of the fair market value of the movie, we have not overlooked the fact that a nonrecourse note was a stated part of the purchase price. Obviously, a nonrecourse note, which the parties realistically expected to be paid in whole or in part, would have to be considered in determining fair market value where the facts and circumstances existing at the time of the negotiations supported such an expectation. However, in this case, we have concluded that neither party believed, or even intended, that any part of the principal of the nonrecourse note would ever be paid. This is amply demonstrated by the estimate Mr. Perlmutter made of the total amount to be received by the purchaser of the movie based on a theatrical gross of $2,500,000 and gross receipts of the distributor of $800,000. This estimate was his most optimistic since it was used in an effort to sell the movie to Mr. Bridges. On the basis of this estimate, Mr. Perlmutter concluded that the American purchaser (D. N. Co.) would receive total receipts from the movie of $217,500. It is true that Mr. Bridges subsequently negotiated a contract more favorable to D. N. Co. than the contract Mr. Perlmutter initially proposed. However, if the same $800,000, estimated by Mr. Perlmutter as the amount of gross receipts received by the distributor from the box office gross with the distributor's retaining only $365,000, is applied to the contract signed between Mr. Perlmutter and Mr. Bridges, the gross receipts from theatrical exhibition received by D. N. Co. over the life of the movie would only be $313,500.

When the specific terms of the nonrecourse note are more closely analyzed, it is even more apparent that the note did not have any economic reality. The note required no payment by D. N. Co. other than a portion of the one-third of the distributor's gross receipts received by D. N. Co. after it had retained $165,000. Since the note was not due for 10 years, which period coincides with the life expectancy of a movie, the seller would not have any right to foreclose on the movie until it was, for all practical purposes, valueless. In addition, the

note carried stated interest of 6 percent. This means that over the 10-year period, total stated interest of $451,500 would be due from D. N. Co. Applying Mr. Perlmutter's optimistic assumption of gross receipts of $800,000 by the distributor to the contract signed by Mr. Bridges, the total payments on the note, which would of course be for the so-called interest, would be a maximum of $121,500.

Based on the provisions of the nonrecourse note here involved, it is clear that any payments of either principal or interest would only be made from the stated percentage of the gross receipts of the purchaser. Since the purchaser could keep and use the property for its entire useful life without any other payments, not only is there no economic incentive to make any further payment, but also it would be foolish for the purchaser to do so. Recognizing that the gross receipts of the purchaser are the only source of any payment on the note, as well as any profit for the purchaser, a reasonable projection of such receipts as of the date of purchase of the movie would be highly relevant in determining not only the fair market value of the movie but also whether any part of the principal of the nonrecourse note would ever be paid. However, in this case, there is no reliable evidence in the record on which to base a reasonable projection of earnings from the movie as of the date the contract was entered into in early October 1974. The income projections of respondent's experts presented at trial were not reliable since, in our view, they were made with hindsight and not as a forecast. Similarly, we do not view the projection made by Mr. Perlmutter based on the overly optimistic estimate of Europix, the distributor, to be reliable, as the record does not disclose the basis of the projection made by Europix or even who made it. However, we do view the seller's projection, which was made in an attempt to sell the film, to constitute a maximum. On this basis, no payment of principal would ever be made on the note, and a maximum of only about one-fourth of the so-called interest would be paid. For this reason, we believe that the parties could only have intended that the cash to be paid was the true indication of what a willing buyer might pay a willing seller for the movie. There is no doubt that an amount no one ever expects to be paid cannot be considered to be a part of the purchase price of property.

There is no similarity between the type of nonrecourse note here involved and a nonrecourse note that calls for some payment, other than from a part of the profits, prior to the expiration of the useful life of the property securing the note. Where payments on the note are required while the property still has some value, a valuable property might be repossessed by the seller if a default were made in payment. Here, no such possibility existed. Furthermore, the nonrecourse note here involved is not comparable to a nonrecourse note given in connection with the purchase of a nonwasting asset such as real estate. Even if no payment is required on a nonrecourse note secured by real estate for an extended period, there is some reasonable possibility that at the end of the extended period, the real estate will have a substantial value. Here, because of the limited economic life expectancy of a movie, no such possibility is present.

The various factors we have considered in arriving at our judgment of fair market value of the movie herein should not be viewed as the establishment of an exclusive set of factors to be considered in all cases. Certainly, it is possible that a reasonable forecast of income from a movie might be a very significant factor in some other case, but the evidence in this case shows no such reasonable forecast. It is also possible that, under other circumstances, the parties might contemplate the payment of the principal of a nonrecourse note given as a part of the stated purchase price of a movie or other property, or that such a note might come due and subject the property to foreclosure while the property securing the note still had value. Again, such is not the situation here. The determination we have made, here, is our best judgment considering all the facts in this record, including the testimony of the expert witnesses, the testimony of the other witnesses, and the documentary evidence in the record.

Based upon all of the evidence, we conclude that while the fair market value of the movie equaled the cash price of $190,000, composed of principal payments of $147,500 and an amount denominated as "prepaid interest" of $42,500, it did not even approach the total purchase price of $900,000 consisting of the stated cash price of $147,500 plus the nonrecourse note of $752,500. Accordingly, the nonrecourse note was not an investment by the partnership in the movie,

as the partnership would never have any economic incentive to pay any portion of the nonrecourse note. In fact, no payments were ever made of principal and no payments of interest were ever made except for the prepayment denominated "interest" made in 1974. Therefore, petitioners are not entitled to any depreciation claimed by the partnership which is attributable to the increase in basis of the movie of $752,500, the face amount of the nonrecourse note.

There still remains the question of whether the depreciation deductions claimed by the partnership, based on the $190,000 cost of the movie after exclusion of the nonrecourse debt from basis, are properly deductible in the years in issue under the income-forecast method of depreciation. It is respondent's position that a proper application of the formula used in the income-forecast method of depreciation results in a deduction of zero for the years in issue because the partnership had received no income in those years under its method of accounting. Petitioners argue that their application of the income-forecast method of depreciation was proper, which calculation used, as its numerator, the gross income reported by the distributor from the film rentals of the motion picture.[7]

Section 167(a)[8] provides that a taxpayer shall be allowed, as a depreciation deduction, a reasonable allowance for the exhaustion of property used in a trade or business. In *Massey Motors, Inc. v. United States*, 364 U.S. 92, 104 (1960), the Supreme Court stated at page 104—

it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the period to which it contributes. * * *

This matching concept underlying the allowance of a

---

[7]In this discussion, we will not consider the claimed first-year depreciation under sec. 179 but will discuss that aspect of the case later in this opinion.

[8]Sec. 167(a) provides in part as follows:

SEC. 167(a). GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business * * *

depreciation deduction has proved to be a difficult one with respect to film property. In Rev. Rul. 60–358, 1960–2 C.B. 68,[9] respondent states that the general methods of depreciation prescribed in section 167(b) are inadequate because a film will typically produce an uneven flow of income, and the usefulness of a film is realistically measured by the flow of income and not simply by the passage of time. For this reason, respondent authorized the income-forecast method for the amortization of the costs of a film, which method ties the amount of the depreciation deduction allowable for each year to the amount of income produced for that period. *Schneider v. Commissioner*, 65 T.C. 18, 32–33 (1975). Petitioner herein does not question the validity of the overall method provided for in the revenue ruling but rather contends that the numerator of the fraction, the income from the film for the taxable year, means income received by the distributor, which income may or may not have been includable in the owner's income under its method of accounting. It should be pointed out that the parties stipulated that D. N. Co. is a cash basis taxpayer and that it did not actually receive any income from the film for the years in issue.

Rev. Rul. 60–358 states that the term "income" means the income from the film less the expense of distributing the film, without deducting depreciation. On brief, respondent contends that the term "income" should include only that amount which is properly includable in income for Federal income tax purposes, for that taxable year, under the taxpayer's method of accounting. In support thereof, he cites Rev. Rul. 78–28, 1978–1 C.B. 61, which states that—

Since the reason for using the income forecast method to depreciate the cost of movie films is to minimize the distortion of income by matching depreciation deductions with income derived from assets giving rise to the deductions, income reflected in the numerator of the fraction used to compute the depreciation deduction for the tax year must reflect the same gross income used to compute taxable income from the film for the same period.

We have, on a number of occasions, held that a revenue ruling published by the Internal Revenue Service does not have the

---

[9]Rev. Rul. 64–273, 1964–2 C.B. 62, specifically allows the income-forecast method to be used for motion picture films.

force and effect of Treasury Department regulations and is not binding on this Court. *Sandor v. Commissioner*, 62 T.C. 469, 481–482 (1974), affd. 536 F.2d 874 (9th Cir. 1976). However, in view of the concept underlying the allowance of depreciation of films, that is, the matching of income with the expenses incurred in the production of that income, the term "income," for the purposes of the computation of depreciation by the income-forecast method, can only be read to mean the amount of income properly reportable by the taxpayer as income under its method of accounting.

D. N. Co. did report $6,958 as income in 1974, which consisted of its one-third share of $3,479, the proceeds of distribution, plus the distributor's one-third recoupment share of $3,479; and it used $6,958 as the numerator in the income-forecast method fraction. Although this indicates that the partnership reported its income figures in a consistent manner, the question remains whether the amounts listed as income were properly reported as such for the years in issue under its method of accounting. See sec. 703; sec. 1.703–1, Income Tax Regs. Section 1.451–1, Income Tax Regs., states that an amount is includable in gross income under the cash method of accounting when such amounts are "actually or constructively received." There is no dispute herein that the partnership did not actually receive any proceeds from the film for the years in issue, as the parties entered a stipulation at trial to that effect. Furthermore, since petitioners do not make any argument that the partnership was in constructive receipt of income from the distributors during this period of time, as defined in section 1.451–2, Income Tax Regs., we can only conclude that D. N. Co. realized no income from the distribution of the film, "Dead of Night," under its method of accounting for the years here in issue. As a result, the numerator of the fraction is zero, which means that there is no depreciation allowable under the income-forecast method.[10]

The next question is whether the partnership is entitled to its claimed deduction of distribution expenses in the amounts of $3,479 in 1974 and $3,479 in 1975. The parties stipulated

---

[10]We note in passing that this does not mean that the partnership would never be entitled to any deduction for depreciation attributable to the movie. Rather, it will be entitled to a deduction in subsequent years when it properly reports income from the film.

that these expenses were, in fact, paid by the distributor. Accordingly, the partnership is not entitled to deduct any of these expenses under its cash basis method of accounting, as these expenses were not paid by the partnership in any of the years in which they were claimed. Sec. 1.461–1(a)(1), Income Tax Regs.

The third question is whether the partnership is entitled to all or any part of the claimed expenses for legal fees of $4,650 in 1974 and legal and accounting fees of $4,704 in 1975. On brief, petitioners concede that the expenses incurred in 1974 were capital expenditures related to the organization of the partnership and the acquisition of the film. Although the deficiency notice stated that the legal and accounting fees claimed as a deduction in the amount of $4,704 in 1975 were disallowed, respondent stipulated at trial that the partnership was entitled to a deduction for legal and accounting fees in the amount of $800. Of the remaining balance of $3,904 which is in dispute, petitioners argue that the partnership is entitled to a deduction of $3,414. Whether the partnership is entitled to a deduction of the stated amount depends on whether the fees were an ordinary and necessary business expense under section 162. The bank records of D. N. Co. show that a check signed by Mr. Bridges dated September 30, 1975, was issued to the law firm of Wofsey, Certilman, Haft, Snow & Becker in the amount of $3,414, with the notation that the check was made out for "legal services." However, copies of the various statements show that the services were rendered in connection with the settlement of a claim by Technicolor with respect to the film, "Dead of Night," which claim Technicolor had threatened to enforce by foreclosing on the movie. This evidence is insufficient to show that the expenses incurred for legal services were not paid for defending or perfecting title to the property, and petitioners have not submitted any other evidence in support of their position. See sec. 1.263(a)–2(c), Income Tax Regs. Therefore, as petitioners have failed to meet their burden of proof, we find for respondent on this item and sustain his disallowance of the claimed deduction.

D. N. Co. deducted commissions paid to FAI Investment Analysts for the sale of interests in the partnership in the amount of $23,400 in 1974. Petitioners did not make any argument on brief and presented no evidence at trial to

establish that this was an ordinary and necessary expense. Accordingly, we hold for respondent as to this item. See *Estate of Boyd v. Commissioner*, 76 T.C. 646 (1981).

On its partnership return of income for the year 1974, D. N. Co. reported that the film, "Dead of Night," was new property with a useful life of 7 or more years, and on this basis, petitioners claimed the full 7-percent investment tax credit on their returns in 1974. On brief, petitioners stated that "The evidence submitted at the trial demonstrates that the Film was not new on October 9, 1974." Thus, petitioners now concede that the film was used property for investment tax credit purposes at the date it was acquired by the partnership. See also sec. 1.48–8(a)(5), Income Tax Regs. The specific question presented is whether section 48(k)(1)(A)[11] has retroactive effect to 1974, the year D. N. Co. purchased the film. If it does, then petitioners would not be entitled to an investment tax credit in 1974.

While admitting that section 48(k) applies only to new motion pictures, petitioners argue that it was intended only as a relief provision that allows owners of new motion pictures to make certain elections which are not available to taxpayers who acquire used motion pictures and, therefore, it does not override the allowance of an investment credit for used property as provided in section 48(c). In our view, petitioners misread section 48(k). Section 48(k), enacted by sec. 804, Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1591, was adopted in order to clear up the past uncertainty with respect to whether the investment credit was available for motion picture films and, if so, in what amounts. See Staff of Joint Comm. on Taxation (H. R. 10612, 94th Cong., 2d Sess.), General Explanation of Tax Reform Act of 1976, 1976–3 C.B. (Vol. 2) 188. While section 48(k) does provide a movie owner with a number of different elections, it also specifically provides that

[11]Sec. 48(k)(1)(A) provides as follows:

SEC. 48(k). MOVIE AND TELEVISION FILMS.—

(1) ENTITLEMENT TO CREDIT.—

(A) IN GENERAL.—A credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film or video tape—

(i) only if such film or tape is new section 38 property (determined without regard to useful life) which is a qualified film, and

(ii) only to the extent that the taxpayer has an ownership interest in such film or tape.

a credit is allowable under section 38 for a motion picture "only if such film or tape is new section 38 property." As a note to section 48(k), section 804(d), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1591, 1596, states as follows:

(d) *Entitlement to Credit.*—Paragraph (1) of section 48(k) of the Internal Revenue Code of 1954 (relating to entitlement to credit) shall apply to any motion picture film or video tape placed in service in any taxable year beginning before January 1, 1975.

Accordingly, it is clear that Congress intended that, with respect to motion picture property, only new property would qualify for the investment tax credit. As petitioners concede on brief that the motion picture, "Dead of Night," was used property at the date of purchase, the investment tax credit claimed by petitioners as partners of D. N. Co. is not allowable. See sec. 1.48–8(a)(1) and (2), Income Tax Regs.

Finally, we must determine the extent to which petitioners are entitled to any of the deductions claimed by D. N. Co. which have not otherwise been disallowed for the years in issue. Respondent contends that these deductions should be allowed only to the extent provided in section 183. Section 183(a) provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."[12] If the activity is not engaged in for profit, then section 183(b)

---

[12]Sec. 183(a) through (c) reads as follows:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term

separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1).

By its express terms, section 183 is an allowance provision which operates only where the activity is "not engaged in for profit," which phrase is defined in section 183(c) to mean an activity for which deductions under section 162 or 212(1) or (2) are not allowable. Therefore, before we can apply the allowance provision stated in section 183(b), we must first determine whether the deductions from the activity are allowable under section 162 or 212.

Petitioners were limited partners in D. N. Co., which was organized as a limited partnership under New York law. On behalf of the partnership, Mr. Bridges, as general partner, purchased the rights to a movie for a total price of $900,000, consisting of $147,500 in cash and recourse notes and a nonrecourse note of $752,500. In its initial return of income for the year 1974, the partnership claimed a depreciable basis for the movie of $900,000 and a deduction for depreciation of $136,125. Although we have agreed with respondent that most of the other deductions claimed in 1974 are not properly allowable, the deductions claimed for travel of $576, and $49 in miscellaneous expenses, have not been questioned. D. N. Co. reported a partnership loss for the year 1974 of $203,350. In 1975, the partnership claimed a depreciation deduction of $220,001, and other deductions which have been allowed, such as travel and administrative expenses and trailer costs, on its return of income, and it reported a loss of $235,172. On its return of income for 1976, the partnership claimed a depreciation deduction of $289,820 and other deductions of $22,844, most of which have not been disallowed by respondent except under section 183, and reported a loss of $311,033. On their returns for each of the years 1974, 1975, and 1976, petitioners

"activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

deducted their percentage share of the stated loss reported by the partnership.

Since the issue here is whether petitioners are entitled to deduct their pro rata share of the partnership loss, they must establish that the partnership was entitled to the claimed deductions for the years in issue under section 162(a).[13] Section 162(a)[14] provides for a deduction for ordinary and necessary expenses paid or incurred during the taxable year in the carrying on of any trade or business. It is petitioners' position that D. N. Co. was engaged in the trade or business of owning and distributing the movie, "Dead of Night." Respondent argues that the partnership was not engaged in a trade or business since the partnership did not own and distribute the movie with the motive or intent to make a profit.

It is well settled that in order to constitute the carrying on of a trade or business under section 162(a), the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. See also *Hager v. Commissioner*, 76 T.C. 759, 784 (1981); *Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioners and respondent agree that the profit motive analysis should be made at the partnership level. For the many reasons stated in our discussion of this issue recently in *Brannen v. Commissioner*, 78 T.C. 471 (1982), we agree that this issue should be resolved at the partnership level.

In order for a partnership to be entitled to a deduction for expenses attributable to a trade or business in computing its

---

[13]Petitioners contend that the movie was property held either for use in a trade or business within the meaning of sec. 162 or for the production of income under sec. 212. As petitioners claimed their pro rata share of the loss reported on the partnership return of income for the years in issue rather than separately accounting for their share of the claimed expenses as provided in sec. 1.702–1(a)(8)(i), Income Tax Regs., it is apparent that petitioners regarded the movie as "property used in a trade or business." Also, petitioners' argument is mainly under sec. 162, with merely a statement that the profit motive determination under sec. 212 would be the same.

[14]Sec. 162(a) provides in part as follows:

SEC. 162(a). IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

taxable income (or loss) under section 703(a), it must be established that the partnership engaged in the activity with the primary purpose and intent of making a profit. *Hirsch v. Commissioner, supra* at 736; *Brannen v. Commissioner, supra* at 505; *Golanty v. Commissioner, supra* at 425; *Hager v. Commissioner, supra* at 784. D. N. Co. need not have a reasonable expectation of profit, but the partnership must have the intent and objective of realizing a profit. *Hirsch v. Commissioner, supra*; *Brannen v. Commissioner, supra*; *Hager v. Commissioner, supra*; *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976); *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). In determining whether the partnership engaged in the activity for profit, all of the relevant facts and circumstances are to be taken into account (*Golanty v. Commissioner, supra* at 426; *Jasionowski v. Commissioner, supra* at 319), and the burden of proving the intent to make a profit is on petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure. While no one factor is to be determinative, greater weight should be given to the objective facts than to the parties' mere statement of their intent. *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979); *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977).

Nine factors are listed in section 1.183–2(b), Income Tax Regs., which should normally be taken into account. These factors are as follows: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

Respondent argues that D. N. Co. was formed and operated solely for the purpose of generating tax deductions for its limited partners, and the manner in which the partnership was operated and the history of losses associated with the film show that there was little chance of the company's ever producing an economic profit. Petitioners contend that al-

though a movie is a high-risk investment, the general partner and the distributors made every effort and spent a substantial amount of time and money in an attempt to make this film a financial success. For these reasons, petitioners feel that the purchase and exploitation of this movie was an activity engaged in for profit.

Once again, we note that we have recently addressed the issue of whether a limited partnership which owned a movie as its principal asset was engaged in the activity for profit. In *Brannen v. Commissioner, supra,* we analyzed the factors which we deemed relevant, all of which proved to be adverse to a finding that the partnership therein was engaged in the activity for profit. The instant case is a much more difficult one, with facts present which lean both for and against petitioners. For that reason, we will proceed on a factor-by-factor basis mindful, of course, that we will not simply add up the "score" and determine the outcome, but rather attempt to weigh all of these factors in reaching our ultimate conclusion. See sec. 1.183–2(b), Income Tax Regs.

We note at the outset that Mr. Bridges, as general partner, obligated the partnership to purchase the movie at a price which exceeded its fair market value. Unlike the facts in *Brannen,* which indicated that the fair market value of the film, which was somewhere between $60,000 and $85,000, did not even approach the $330,000 cash price paid, much less the total purchase price of $1,730,000, the relevant figures in the instant case are not so disparate. While the $190,000 fair market value of the film certainly did not reasonably approximate the $900,000 purchase price, the value did at least equal the cash price paid for the film.

In addition, when it subsequently became known to Mr. Bridges that the film would not be immediately successful, he arranged with Mr. Perlmutter to delay payment on the $75,000 balance of the recourse portion of the purchase price and used the subsequent capital contributions by the limited partners to pay the expenses of distribution in an effort to get the film back in effective distribution. Thus, while we realize that Mr. Bridges placed the partnership at a disadvantage due to the inflated purchase price, we also note that there are a number of mitigating factors and that Mr. Bridges made an extensive effort to make this film a success.

Turning to the relevant factors listed in the regulations, we conclude that the partnership was operated in a very business-like manner. First, unlike the facts in *Brannen*, the distribution agreement herein was not with a related entity and did not have any "abnormal" provisions such as the advance payment of cash by the partnership to the distributor. More importantly, Europix, the distributor, spent a total amount of approximately $130,000 on the distribution of this particular film, although the distribution agreement stated that Europix was only obligated to spend at least $30,000 in the promotion and advertising of the film. The person in charge of distribution for this film, Mr. Kilgore, had extensive experience in the movie distribution industry and had previously directed the entire distribution effort for a number of "horror" films which were financially successful.

Another indicator of the businesslike manner in which the activities of the partnership were conducted was that Mr. Bridges was continuously and actively involved in the progress of the distribution of the film. First, he wrote a significant number of letters to the limited partners in an effort to keep them informed on matters ranging from distribution reports to changes in the overall marketing strategy for the film. For example, in a letter dated August 15, 1975, he explained that Europix had gone into bankruptcy, but that he had arranged for a new distributor to take over the film and that an entirely new advertising campaign, complete with a change in the name of the film, was in progress at that time. In addition, Mr. Bridges negotiated a settlement with Technicolor for debts owed it with respect to the production of the prints of the film, with the result that Technicolor would not foreclose on the film and stop all distribution. About this same time, he was also arranging for a delay in the payments to Mr. Perlmutter for the original purchase price so that the additional capital contributions collected from the limited partners in 1975 could be used to pay expenses of the further distribution of the film.

When this second distribution arrangement did not work out in a satisfactory manner, Mr. Bridges bought the distribution company, put Mr. Kilgore in charge, and arranged for yet a third advertising campaign and a title change. See sec. 1.183–2(b)(1), Income Tax Regs. With respect to the television rights of the film, Mr. Bridges entered into a television

exploitation agreement with Ben Barry, which agreement stated that Ben Barry was entitled to a 35-percent fee. However, Mr. Bridges subsequently persuaded the company to reduce the percentage to 30 percent and, after receiving the first report, he immediately wrote a letter back stating: "You have shown a deduction of 35% whereby our agreement was to be 30%. I would appreciate your making an adjustment and reflecting this on the next statement." Overall, it is clear from the record that Mr. Bridges was continuously involved in the exploitation of the film and actively sought to protect the interests of the partnership.

We next consider the expertise of the persons associated with the partnership. The facts indicate that at the time the partnership was formed, Mr. Bridges was generally involved in the investment planning business, which included oil and gas investments, land syndications, and the insurance business. He had also been involved with two other films prior to the purchase of "Dead of Night." Thus, although he did have some prior experience in the movie business, he would certainly not have qualified as an "expert." However, the man who was actually in charge of the distribution of the film, Mr. Kilgore, was an expert in this area. Mr. Kilgore had extensive prior experience in not only the movie business, in general, but specifically in the marketing of "horror" pictures. He testified that under his direction, a number of low-budget films had made money, and Mr. Schimmel, the president of Europix, stated that Mr. Kilgore, overall, had made money for Europix. In addition, Mr. Perlmutter initially agreed to permit Europix, and, specifically, Mr. Kilgore, to distribute "Dead of Night" because Europix had previously done a good job distributing an earlier film of Mr. Perlmutter's, and Mr. Kilgore was basically a very enthusiastic individual. For these reasons, we conclude that the person in charge of the actual distribution of the film, Mr. Kilgore, was highly qualified to perform these duties.

The regulations indicate that the term "profit" also includes an expectation that the assets used in the activity may appreciate in value. Since we have found, above, that the fair market value of the movie was $190,000, whereas the stated purchase price was $900,000, it is quite apparent that the movie would have needed to appreciate substantially just to

equal the stated purchase price, let alone show a profit. Therefore, we must view this factor as one which supports respondent's position.

The final factor to consider in this case is the history of losses reported by D. N. Co. The partnership reported losses of $203,350, $235,172, and $311,033 for the years 1974, 1975, and 1976, respectively, which losses were due in large part to the depreciation deductions attributable to the film. Although we view these large and continuous losses as a significant factor against petitioners' position, we must point out that the regulation states that such factor can be mitigated by the existence of unforeseen, independent events which have contributed to such losses. See sec. 1.183–2(b)(6), Income Tax Regs. After distribution had begun on the film, Europix began experiencing financial difficulties in the fall of 1974. Evidently, the subdistributors knew that Europix was having problems, and they were not remitting the film rentals produced by the movie to Europix. Also, while Europix did collect some of the film rentals, it never turned any of the money over to D. N. Co., and such moneys were simply consumed by Europix. Thus, not only did Europix not have the money to effectively continue the distribution effort, but the partnership never received any of the proceeds so that it could be in a position to spend more of its own money on the film as it in fact did in later years.

There are two other factors which might explain the losses. First, of the $130,000 expended by Europix for distribution of this film, approximately $80,000 was spent in advance for prints alone. While this expenditure shows Mr. Kilgore's confidence in the movie and its ability to produce income, Mr. Kilgore testified that this was a critical mistake, as only a small percentage was left for promotion and advertising. Second, the opening scene in the movie, in which Andy is killed in combat, reminded the viewer of the Vietnam conflict. A number of experts who testified at trial stated that this reminder of Vietnam, in 1974, probably "turned-off" a large part of the younger moviegoing audience. While these problems do not totally explain the substantial losses incurred by the partnership, they do show that the exploitation effort on this film by the partnership was off to a very poor start from

which it never recovered and that there were a number of independent factors working against the film.

Based on all of the evidence presented at trial, we conclude that petitioners have sustained their burden of proving that the partnership was in fact engaged in the exploitation of the movie, "Dead of Night," for profit. The general partner, Mr. Bridges, worked very hard to further the interests of the partnership and wrote a substantial number of letters to all of the parties involved and to the limited partners in an effort to keep them currently advised. The distribution of the film was handled by a person who was highly qualified to handle this particular type of film, and the complete advertising campaign was totally revised three times, which included an actual change in the title of the film on two occasions, in an effort to make the film a success. In addition, a substantial amount of cash was spent by the distributor and by the partnership, itself, in an effort to make the film successful. Although the overall expectation of profit may not have been reasonable, the facts clearly indicate that the partnership did have the intent and objective of realizing a profit. As a result, the partnership is entitled to the deductions claimed under section 162, except as limited above, and petitioners are entitled to their distributive share of the losses for the years here in issue.

The partnership had elected to deduct additional first-year depreciation under section 179. Section 1.179–1(a), Income Tax Regs., provides that "The allowance under section 179 is in addition to the depreciation allowable under section 167." Therefore, although the partnership was not entitled to a depreciation deduction under the income-forecast method, it is entitled to a depreciation allowance under section 179 if a deduction would have otherwise been allowable under section 167(a). Respondent's only reason for disallowing the partnership's claimed deduction for first-year depreciation was that the partnership was not engaged in a trade or business in 1974, as it had no profit motive. Since we have concluded, above, that the partnership was engaged in the activity for profit, it follows that the partnership is entitled to a deduction in 1974 under section 179 for first-year depreciation, except that the cost of the movie is $190,000 rather than the claimed cost of $900,000. Accordingly, the proper amount allocable to

petitioners must be recomputed on this basis. See sec. 1.179–2(d), Income Tax Regs.

*Decisions will be entered under Rule 155.*