JOHN A. BROYLES and SHIRLEY S. BROYLES, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Broyles v. Commissioner
Docket Nos. 427-80, 3958-80, 3960-80, 3961-80.
United States Tax Court
T.C. Memo 1982-482; 1982 Tax Ct. Memo LEXIS 262; 44 T.C.M. (CCH) 908; T.C.M. (RIA) 82482; August 23, 1982. Sheldon E. Friedman and Robert J. Kaufman, for the petitioners. Mark W. Nickerson, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These cases were assigned to Special Trial Judge Randolph F. Caldwell, Jr., for trial or other disposition, pursuant to the provisions of section 7456(c) of the Internal Revenue Code of 1954, as amended, and Rule 180 of the Tax Court's Rules of Practice and Procedure. The order of assignment, dated February 12, 1981, provides that the post-trial procedures set forth in Rule 182 are not applicable. The Court agrees with and adopts the Special Trial Judge's opinion, which is set out herein below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: Respondent determined deficiencies for calendar *263 years and in amounts, as follows: John A. Broyles and Shirley S. Broyles Docket No. 427-80
Year
Deficiency
1974
$11,700.42
1975
4,466.50
Arthur S. Slack Docket No. 3958-80
Year
Deficiency
1972
$ 3,854.68
1973
32,872.84
1974
24,687.24
1975
5,652.15
Charles H. Christiansen, Jr., and Helen W. Christiansen Docket No. 3960-80
Year
Deficiency
1974
$10,830.34
1975
5,156.50
John S. Frost and Ronda B. Frost Docket No. 3961-80
Year
Deficiency
1974
$7,760.00
1975
4,027.00
Pursuant to an order dated February 17, 1981, the issues in the Slack case, at Docket No. 3958-80S relating to two limited partnerships, The Mulberry Company and Cinefai Associates, were severed from the remaining issue in that case, and the Slack case (insofar as it involved issues relating to The Mulberry Company) was consolidated for trial briefing and opinion with the Broyles,Christiansen, and Frost cases, at Docket Nos. 427-80, 3960-80, and 3961-80, respectively. The issue for decision is whether the petitioner-husbands, each of whom was a limited partner in a partnership, The *264 Mulberry Company, are entitled to deduct on the joint returns filed with their spouses their proportionate shares of the losses reported on the partnership's information returns for 1974 and 1975, arising from the production of a moving picture "It Seemed Like a Good Idea at the Time" (hereinafter called "Good Idea"). Those losses represent the expenses of producing "Good Idea," the partnership having reported no income for either year. Petitioner Slack conceded at the trial that he was not entitled to deduct his partner's share of such losses. FINDINGS OF FACT Some of the facts were stipulated. The stipulations of facts, together with the exhibits identified therein, are incorporated herein by reference. Each of the petitioners resided in or near Atlanta, Georgia, at the time the petitions were filed. The returns of all the petitioners for the years 1974 and 1975 were filed with the Internal Revenue Service Center at Chamblee, Georgia. During the taxable years 1974 and 1975, all of the petitioners reported their income on a calendar-year basis, using the cash receipts and disbursements method of accounting. The Mulberry Company, a Georgia limited partnership (hereinafter *265 called, "Mulberry") filed its partnership returns for the years 1974 through 1980, with the Chamblee Service Center. Such returns were for calendar years, and were based upon the cash receipts and disbursements method of accounting. Petitioner John Broyles (Broyles) is a medical doctor, specializing in the practice of dermatology. Petitioner Charles Christiansen (Christiansen) is a senior vice president of Pharr Yarns and Company, which was engaged in a business of selling yarns to carpet manufacturers. John Frost (Frost) is the western regional sales manager for the Frost and Davies Printing Company. Mulberry was organized on November 7, 1974, as a Georgia limited partnership. Article 19 of the partnership agreement provides that Mulberry would provide "production services to the owners of film rights of various literary or dramatic properties. * * * As its first venture, the Partnership will provide production services and certain financing to the owners of the film rights to ["Good Idea"]." During the period between November 7 and December 30, 1974, Broyles, Christiansen, and Frost became limited partners in Mulberry. Between 1968 and 1971, David Perlmutter *266 (Perlmutter) a Canadian chartered accountant, was engaged in a business of providing consulting services in the areas of public financing, securities, and general corporate finance. One of Perlmutter's clients was John Trent (Trent), a moving picture director and producer. On September 17, 1971, Perlmutter and Trent formed Quadrant Films, Ltd. (Quadrant), an Ontario corporation, for the purpose of engaging in all activities pertaining to the production and distribution of moving pictures. Perlmutter's primary responsibility was to arrange financing for Quadrant's films, while that of Trent was to take care of the artistic aspects of the business. Between September 17, 1971 and December 31, 1973, Quadrant produced five full-length feature films. In the July 1975 issue of Entertainment,Toronto's Entertainment Magazine, it was stated that Quadrant "is virtually the only successful independent film production company in English Canada." On September 18, 1973, Quadrant acquired an option to purchase the screenplay rights to a literary property by Claude Harz, entitled "For Love or Money." Thereafter, Quadrant released its option so that a new agreement could be executed *267 between Harz and Velvet Film Productions, Ltd. (Velvet), Quadrant's wholly-owned screenplay subsidiary. Velvet's staff, together with David Main and John Trent, then produced an original screenplay entitled "It Seemed Like a Good Idea at the Time," based upon "For Love or Money." On February 21, 1974, Perlmutter organized Tertius Film Investors, Ltd. and Company (Tertius), an Ontario limited partnership for the purpose of investing in, holding, and exploiting motion picture films. The general partner of Tertius was Tertius Film Investors, Ltd. (Tertius, Ltd.), an Ontario corporation also established by Perlmutter on February 21, 1974. According to the partnership agreement, Tertius, Ltd., had exclusive control of the management of Tertius' business; and the limited partners had no authority to conduct business on behalf of the partnership. Quadrant managed the business affairs of Tertius through Tertius, Ltd. Barbara Farrell, Perlmutter's secretary for the past 18 years, was a corporate officer in both Quardrant and Tertius, Ltd. She signed virtually all of Tertius, Ltd.'s correspondence and contracts. In substance, Perlmutter exercised control over the business affairs *268 of both Quadrant and Tertius by virtue of his position as president of Quadrant. In 1974, a Canadian investor in a limited partnership holding the copyright on a film could deduct 60 percent of his pro rata share of the cost of producing the film as a capital loss allowance on his Canadian income tax return. Moreover, his investment could include both cash and notes. Hence, it was possible for a Canadian limited partner to realize a tax savings in excess of his actual cash investment. Tertius was set up to hold the copyright on "Good Idea" so that the limited partners in Tertius could take advantage of the tax benefits under Canadian law. On August 14, 1974, Perlmutter asked the Canadian Film Development Corporation (CFDC) to make an investment of $250,000 (Canadian) in the production of "Good Idea." In the application, Quadrant was listed as the production company; John Trent was listed as the director and co-producer; and David Perlmutter was listed as co-producer and executive producer. The film was to be shot in Toronto and its environs in the period between September 23 and November 3, 1974. The budget was to be $957,086. CFDC is a Crown Corporation established by *269 an Act of Parliament on March 10, 1967, for the purpose of fostering the development of a feature film industry in Canada. CFDC attempted to achieve this purpose by investing in Canadian feature films and by supporting Canadian production companies. According to its charter, CFDC could only invest in Canadian feature film productions. The term "Canadian feature film production" is defined as: [a] feature film production in respect of which the Corporation has determined (a) that the completed film will, in the judgment of the Corporation, have a significant Canadian creative, artistic and techincal content, and that arrangements have been made to ensure that the copyright in the completed film will be beneficially owned by an individual resident in Canada, by a corporation incorporated under the laws of Canada or a province or by a combination of such persons; or (b) that provision has been made for the production of the film under a co-production agreement entered into between Canada and another country. CFDC interpreted the phrase "significant Canadian creative, artistic and technical content" as requiring that the producer, director and key technical personnel be *270 Canadian residents. Americans could not function in these roles if CFDC invested in a film, because Canada did not have a co-production agreement with the United States. On August 16, 1974, Perlmutter wrote to Richard Bridges, the promoter of Mulberry, enclosing a copy of the script of "Good Idea," a proposed budget, and a financing proposal. Perlmutter was seeking an investment of $300,000 by a United States production service company with the ultimate ownership of the copyright to remain in the Canadian investment group. On or about August 26, 1974, Quadrant entered into an agreement for casting services for "Good Idea" with Caro Jones Associates, of Hollywood, California. On August 28, 1974, the CFDC staff recommended that CFDC invest $200,000 in "Good Idea," basically on the strength of Quadrant's participation as the production company. The staff recommended the project because one of CFDC's goals was to strengthen Canadian production companies. On September 8 and 9, 1974, CFDC's board of directors approved an investment of $200,000, rather than the $250,000 requested. During September 1974, Perlmutter was engaged in the process of locating additional financing *271 for "Good Idea." He and Trent flew to New Orleans to talk with a group of potential investors. When nothing came of that meeting, Perlmutter went to Atlanta to talk to Bridges. After a number of discussions, Bridges on October 16, 1974, submitted a proposed agreement in principle regarding the financing of "Good Idea." That agreement contemplated that Bridges' corporation, Financial Analysts, Incorporated (Financial Analysts), would contribute $300,000 towards a budget of $1,100,000 in exchange for a net profit participation of 16.2 percent. In addition, Financial Analysts was to be given a deferment of $75,0008 payable after all investors had recouped their capital but before any other deferments, to cover the costs of raising the required capital and paying the legal and accounting expenses of preparing the private placement memorandum. To protect the proposed investment, Bridges insisted that Tertius (which was contemplated to be the production company responsible for producing and arranging for the distribution of the film) make, interalia, the following representations: (a) That Elliott Gould or Alan Alda would play the main role; (b) That there would be a *272 completion bond by an established, recognized bonding company; (c) That Tertius would hold Financial Analysts harmless from any claims arising from the production of the film; (d) That Tertius would fully insure the picture and name Financial Analysts on all such policies as its interests may appear; and (e) That first liens and security interests would be granted to all parties on a paripassu basis. In addition, Bridges demanded: (a) That Financial Analysts have the right to approve all subsequent contracts; (b) That all checks be signed by Financial Analysts upon the submission of approved vouchers. (These checks would also be countersigned by Tertius designee.); (c) That Financial Analysts be given monthly production reports and a certified cost statement for the picture within 90 days after delivery of an answer print; and (d) That no changes in the script or budget be made without the approval of Financial Analysts. Finally, Bridges stated his understanding to be that Financial Analysts would enter into a production services contract with Tertius' designee and that Financial Analysts would receive a non-recourse loan in the amount of $800,000 from *273 the Bank of Nova Scotia. On October 24, 1974, Tertius purchased all the rights to the "Good Idea" screenplay from Velvet for $40,000, a deferment of $20,000, and a 10 percent participation in the net profits. The $40,000 was paid to Velvet by means of a check dated November 19, 1974, signed by Perlmutter and Elizabeth Butterfield. On October 25, 1974, Tertius entered into an employment contract with Claranton Management, Ltd., for the services of David Perlmutter as the producer of "Good Idea" for a total compensation of $45,000. Claranton Management, Ltd., is Perlmutter's personal services corporation. On October 25, 1974, Tertius entered into an employment contract with Five Continents Productions, Ltd., for Trent's services as director of "Good Idea," at a total compensation of $45,000. Five Continents is Trent's personal services corporation. In an invoice dated October 25, 1974, Quadrant billed Mulberry for pre-production costs relative to "Good Idea." At a date not shown by the record, Quadrant received payment of $2,500 on that invoice. On October 26, 1974, Tertius responded, on Quadrant's letterhead, to Bridges' offer of financing with a counterproposal. Therein *274 Tertius agreed to Bridges' conditions with the following material exceptions: (a) The proposed budget would be $1,200,000, instead of $1,100,000; and Financial Analysts would be expected to contribute $400,000 instead of $300,000 in exchange for a net profit participation of 20 percent instead of 16.2 percent; (b) The final casting for the lead role would be subject to the approval of Financial Analysts if the male lead were not Elliott Gould or Alan Alda; (c) The completion bond would be provided by Velvet Film Guarantors, Ltd. (Velvet Guarantors), instead of an independent bonding company; (d) Quadrant would provide a non-recourse loan of $800,000 instead of the Bank of Nova Scotia; and (e) Financial Analysts' deferment would be $100,000 instead of $75,000. On October 29, 1974, Bridges filed an employer registration form with the Canadian Department of National Revenue. On that form, Bridges certified that Mulberry began to operate as a business on October 15, 1974. (It is stipulated that Mulberry was established as a Georgia limited partnership on November 7, 1974). Bridges represented in said registration form that the address of the partnership was 38 Isabella *275 Street, Toronto, which is the address of Quadrant and its numerous affiliated companies. On November 1, 1974, Elizabeth Butterfield, an employee of Quadrant and member of the Quadrant production team, who was the production manager for "Good Idea," obtained a comprehensive insurance binder from Seymour Alper & Company, Ltd., a Canadian insurance agency, insuring all aspects of the production of "Good Idea." Quadrant was listed as the insured and as the production company on the policy, although Quadrant's name was later crossed out and the names of Tertius and Mulberry were inserted as the insureds. On November 4, 1974, Quadrant entered into an employment contract with Paul Swehon for the sculpture to be used on the set of "Good Idea." At the conclusion of filming, all sculpture was to become the property of Quadrant. Elizabeth Butterfield signed the contract on behalf of Quadrant. On November 7, 1974, Mulberry entered into a production services agreement with Tertius. According to the terms of the agreement, Mulberry was: (a) to render "all necessary services" to manufacture "Good Idea" substantially in accordance with the budget dated October 1, 1974, and to pay all costs *276 incurred in the production of the film; (b) to keep and maintain books and records relating to the production, make the necessary withholdings and deductions, and file appropriate and required reports with governmental authorities; (c) to maintain a special production bank account at the Bank of Nova Scotia, in which all production moneys were to be deposited; and (d) to maintain or cause to be maintained negative and cast insurance and workmen's compensation insurance for "Good Idea." The agreement also contained the following representations on the part of Mulberry: (a) that "Good Idea" would be produced by Perlmutter and directed by Trent; (b) that the picture would have a cast including Anthony Newley, Stefanie Powers, Lloyd Bochner, Isaac Hayes, and Yvonne DeCarlo; (c) that the picture should be produced using certain technical personnel, including Elizabeth Butterfield as the production manager, Diane Caron as the production accountant, and Barbara Farrell as secretary to the producer; (d) that Mulberry would satisfy all obligations and duties under a completion agreement with Velvet Guarantors; and that Mulberry would not alter or amend the budget without the *277 prior approval of Tertius. Under the terms of the production services agreement, Tertius: (a) warranted that Mulberry should have the right to approve the distribution agreement between Tertius and a distributor of the picture, prior to the execution of said agreement by Tertius; (b) agreed to pay Mulberry a sum not to exceed $2,543,235 (U.S.), payable in the following order: (1) the sum of $813,825 in quarterly payments of $50,000 each commencing April 15, 1976, and continuing until January 1980, the last installment to be in the amount of $63,825 [sic], each installment to be accompanied by an additional payment of an amount which would be payable by Mulberry to Quadrant as interest on a non-recourse note; (2) 33 percent of the first $1,200,000 of gross proceeds received by Tertius; (3) 100 percent of the next $100,000 of gross proceeds received by Tertius, with the proviso that if Velvet Guarantors were required to pay any production expenses, then Mulberry would recover its $100,000 paripassu with Velvet Guarantors; and (4) percent of the next $6,216,275 of gross proceeds received by Tertius, after deferments had been paid to Anthony Newley and Velvet *278 in the respective amounts of $25,000 and $20,000. Tertius and Mulberry agreed in the foregoing agreement that Tertius would be the sole owner of "Good Idea;" that Mulberry would not exploit, advertise, or publicize the film; and that Tertius and Mulberry would not be deemed a joint venture or partnership for any purpose under said agreement. Mulberry's production services agreement with Tertius was not a standard arrangement because the Canadian film industry did not utilize production services companies. On November 7, 1974, Mulberry entered into a completion guarantee contract with Velvet Guarantors, pursuant to the terms of which Mulberry was to pay Velvet Guarantors $30,519 in consideration of the latter's promise to advance sufficient funds to complete production of "Good Idea" if it went over budget. The completion quarantee was signed on behalf of Velvet Guarantors by Kent Walwin who was a director, officer and shareholder of Quadrant. Velvet Guarantors was a wholly-owned subsidiary of Quadrant. On November 7, 1974, Mulberry executed a non-recourse note, a loan and security agreement, and an assignment of contract rights. Under these agreements Mulberry borrowed *279 $813,835 (U.S.) from Quadrant on a non-recourse basis at 10 percent interest, to be repaid in quarterly installments of $50,000 commencing on April 20, 1976, and continuing until January 20, 1980, with the last installment to be in the amount of $63,835. [2] As security for the loan, Mulberry gave Quadrant a first and paramount lien on its contractual rights to compensation under Mulberry's production services agreement with Tertius. Upon repayment of the loan in full, Quadrant agreed to release and reassign to Mulberry all security under the loan and security agreement. On November 7, 1974, Quadrant entered into an agreement with Tertius, whereby Quadrant received an advance of $845,650 (Canadian) from Tertius as security for making the loan to Mulberry. This advance was to be repaid out of the proceeds received by Quadrant from Mulberry in repayment of Quadrant's loan to Mulberry. On November 7, 1974, Tertius *280 assigned its employment contracts for the services of Perlmutter as producer and Trent as director, to Mulberry. Also, on November 7, 1974, Mulberry executed a blanket authorization for Perlmutter to act as Mulberry's agent in all areas of the production of "Good Idea." Bridges, the general partner in Mulberry, had no experience in the production of motion pictures. Finally, as mentioned above, on November 7, 1974, Elizabeth Butterfield obtained a binder on a $500,000 comprehensive general liability from the Alper insurance agency. The policy subsequently issued by the Commercial Union Insurance Company on November 12, 1974, was in the name of Quadrant because the application for insurance was in Quadrant's name. The insureds were later changed to Tertius and Mulberry by a rider dated November 29, 1974. On November 12, 1974, Trent, a director and officer of Quadrant, signed a contract in Mulberry's name on Quadrant letterhead with Harry Makin as director of photography for "Good Idea." The record does not show that Trent was authorized to act as Mulberry's representative. On November 15, 1974, Tertius entered into a contract with CFDC, whereby CFDC agreed to invest $200,000 *281 (Canadian) in "Good Idea." Under this agreement, CFDC was entitled to 25 percent of the gross proceeds from the exploitation of the film until it had recouped its investment, paripassu with the other investors. Then, after all investors had recouped their investments and all deferments had been paid, CFDC was entitled to 8.33 percent of Tertius' gross profit in perpetuity, a rate of participation less than that accorded Mulberry. As a condition to its participation, CFDC required that Tertius make, interalia, the following representations: (a) that Tertius had acquired all right to the screenplay and would not transfer any of such rights without the prior written consent of CFDC; (b) that Tertius had undertaken the production of a film based on the "Good Idea" screenplay and that no changes in the screenplay or budget would be made without the prior written consent of CFDC; (c) that Tertius would negotiate a distribution contract with Ambassador Film Distributors, Ltd., for the exploitation of the film in Canada; (d) that Tertius had entered into a contract with Mulberry, whereby Mulberry had agreed to render production services to Tertius and to carry *282 out all of the physical requirements for the production of the film, including providing financing in the amount of $400,000; (e) that further financing for the film would be provided, as follows: Tertius
$450,000
Impact Quadrant
50,000
Famous Players, Ltd.
50,000
Ambassador
50,000
(f) that Perlmutter would produce the film and Trent would direct the film; (g) that principal photography would begin on November 18, 1974, and, subject to delays beyond Tertius' control, be completed by January 15, 1975; and that the film would be delivered to a distributor by June 30, 1975; (h) that the film would be shot in Canada, and that the underscoring for the film would be composed by a Canadian and recorded in Canada; (i) that the film laboratory would be Canadian and the post-synchronization and mix would be performed in Canada; (j) that no actors, actresses, musicians, technicians, or crew would be employed without the consent of CFDC, so that the completed film would have significant Canadian content (CFDC accepted the participation of non-Canadians Anthony Newley, Stefanie Powers, and Isaac Hayes); (k) that the negative and the original printing materials *283 would be retained in Canada; (l) that Tertius had obtained an insurance policy; and (m) that Tertius would not enter into any contracts for the production, financing, or distribution of the film in addition to the foregoing without the prior written consent of CFDC. In addition to requiring that Tertius make the above representations, CFDC established the following controls to safeguard its investment: (a) All funds to be used in the production of "Good Idea" were to be placed in a special bank account. All checks drawn on such account were to be signed jointly by Tertius' representative and a representative of CFDC. (b) Representatives of CFDC were to be permitted on the set at all times. Further, these representatives were to be granted the right to screen all daily rushes and to review the production books of account. (c) After the film was completed, CFDC was to be allowed to conduct an audit of all expenses of production. (d) After the film was released, Tertius was to provide CFDC with quarterly reports of all revenue derived from exploitation of the film. Further, representatives from CFDC were to be permitted to examine all distribution records. Although *284 CFDC hoped to realize a profit on its investment, it contributed $200,000 primarily to aid in the development of Quadrant as an emerging, independent Canadian film production company, consistent with its statutory objective of fostering the development of the Canadian feature film industry. Initially CFDC was concerned over the involvement of Mulberry as a production service company, ostensibly charged with the responsibility of producing the film. However, upon further study, CFDC concluded that Mulberry's real function was to provide financing and that the Quadrant production team would actually produce the film. To insure that the substance of the transaction would be in accordance with CFDC's understanding, CFDC required a guarantee from Quadrant in its agreement with Tertius, as follows: Intervention of Quadrant Films Limited In order to induce the Canadian Film Development Corporation ("C.F.D.C.") to enter into the aforesaid agreement, Quadrant Films Limited hereby guarantees the performance of all the obligation of Tertius Films Investors Limited and Company under the aforesaid agreement and as specified in Schedule "G," the performance of all the obligations of the *285 Mulberry Company as specified in Schedule "F" and "O" and the performance of all the obligations of Velvet Film Guarantors Limited as specified in Schedule "O," all said Schedules being annexed to the aforesaid agreement. In addition, should there be any conflict or contradiction between any of the terms of the aforesaid agreement and the terms of any agreement to which Tertius Film Investors Limited and Company is a party respecting the production, financing and or distribution of the Film, Quadrant Films Limited guarantees that the terms of the aforesaid agreement shall prevail. Without limiting the foregoing in any way, any fee or override for any work which Quadrant Films Limited or its British counterpart, Impact Quadrant Films Limited, may do concerning the distribution of the film will in no way reduce the amount to be computed under clause 7 of the aforesaid agreement. Perlmutter and possibly Trent negotiated the contracts of the major stars; while Perlmutter or a member of his staff negotiated the employment contracts of the other actors and actresses. Between November 12 and November 25, 1974, contracts in the name of Mulberry, signed by Perlmutter, were entered into *286 for the services of the major stars. Perlmutter also signed all of the contracts for the other principals, bit players, and stuntmen, except for one contract which was signed by Trent, a shareholder, director, and officer of Quadrant. "Good Idea" was filmed in Toronto. Principal photography began on November 18, 1974, and was complted by December 31, 1974. The technical expertise required for the production of "Good Idea" was provided by the Quadrant production team. During the filming of "Good Idea," Perlmutter, as the line producer, was in complete control of the daily operations. Perlmutter did not have written communication with Bridges pertaining to the production of "Good Idea" during the shooting of the film. Perlmutter had few, if any, telephone conversations with Bridges during the filming. During the period between November 18 and December 31, 1974, when the principal photography was completed, neither Bridges nor any employee ever visited the set. His in-house certified public accountant and another member of his staff did come to Toronto on occasion after the filming was completed. Although Mulberry was charged with the duty of maintaining the books and *287 records pertaining to the production of "Good Idea" under the production services agreement with Tertius, such books and records were actually kept by Diane Caron, the corporate bookkeeper for Quadrant. Quadrant retained possession of the books and records except on two occasions when Perlmutter shipped them to Atlanta at the request of respondent. During the period between November 18 and December 31, 1974, neither Bridges nor any employee of Mulberry examined the books and records to determine whether expenses were properly charged to the production of "Good Idea." On November 29, 1974, the Firemen's Fund Insurance Company issued a comprehensive insurance policy based on the binder which Elizabeth Butterfield had procured on behalf of Quadrant. The names of the insureds on the policy were Tertius and Mulberry. On December 3, 1974, Mulberry obtained a certificate of business registration in Ontario, Canada, on which it was stated that Mulberry began business on December 3, 1974, whereas principal photography had begun on November 18, 1974. In connection with the production of the film, three bank accounts were established with the Toronto branch of the Bank of Nova Scotia: *288 (1) Account 3148-11 entitled "COUP Films Trading as the Mulberry Account;" (2) Account 310-11 entitled "Mulberry Account;" and (3) Account 13799-17 entitled "The Mulberry Company." Account Nos. 3148-11 and 310-11 were the main operating and petty cash accounts, respectively, for the production of "Good Idea." Checks on both of these accounts could be negotiated only if they were signed by Perlmutter, Trent, Peter James, or Barbara Farrell, all of whom were members of the Quadrant production team, and countersigned by one of two employees of CFDC. The third account, 13799-17 was used to fund the main operating and petty cash accounts. Checks on 13799-17 could be negotiated only if they were signed by Perlmutter, Trent, or Elizabeth Butterfield and countersigned by Bridges or Leon Rossman, Mulberry's in-house accountant. Although Mulberry had contracted to contribute $400,000 (U.S.) toward the production of "Good Idea," the partnership provided only $387,000. The shortfall has been partially made up by withholding an unspecified amount of funds otherwise due Mulberry from the proceeds of distribution. On May 2, 1975, the post-production phase on "Good Idea" was completed, and *289 the film was ready for release. According to an audit by independent accounts on behalf of CFDC, the film came in at $38,498 over budget. According to that report, Velvet Film Guarantors contributed only $13,000 toward making up the overrun. At the beginning of the film, there is a credit to the effect that the film is a Quadrant film. At the end, there is a credit to the effect that production services were provided by Mulberry. "Good Idea" was certified as a Canadian feature film. In 1974, in order to qualify as a Canadian feature film, the producer, two-thirds of the important creative talents, and two-thirds of the cast had to be Canadians. The qualification of "Good Idea" as a Canadian feature film permitted the Canadian investors to claim certain tax benefits on their Canadian income tax returns. As hereinabove found, Mulberry was organized as a Georgia limited partnership on November 7, 1974. It consisted of a general partner and an original limited partner. The general partner and the original limited partner had the following intrests: Prior to limited partner's recoupment of his contribution
Capital
Profits/Losses
General partner
1%
1%
Limited partner
99%
99%
*290 After limited partner's recoupment of his contribution
Capital
Profits/Losses
General partner
25%
25%
Limited partner
75%
75%
Under the limited partnership agreement, the entire interest of the original limited partner could be divided up into an unspecified number of partnership units to be held by not more than 35 persons. Upon the admission to the partnership of persons owing at least 20 partnership units, the contribution of the original limited partner was to be redeemed, thereby terminating his interest. The general partner of Mulberry was responsible for the management of the affairs of the partnership and the operation of its business. The limited partner or partners could neither act for the partnership nor take part in the conduct of its business. Mulberry's general partner and original limited partner were Bridges and Leon Rossman, respectively. Rossman was simply a nominee. Bridges graduated from the Georgia School of Technology in 1959, with a degree of bachelor of science in industrial management. While attending college, Bridges worked as a life insurance and mutual funds salesman. After graduation, he became a full-time *291 life insurance salesman, and later an executive with several life insurance companies. On December 1, 1970, Bridges formed a Georgia corporation, the above-mentioned Financial Analysts, of which he was the president and major stockholder. The corporation was engaged in the business of providing financial planning, including tax planning, to investors. Between December 1, 1970, and June 26, 1972, Bridges and Financial Analysts participated in the sale of interests in various programs, including the Premier Corporation Cattle Program and Petro-Search Income Program, Series I, a non-leveraged oil and gas deal. On June 26, 1972, Financial Analysts purchased all of the stock of the Omnibus Corporation (Omnibus) and renamed the corporation FAI Investment Analysts, Inc., (FAI). Omnibus had been registered with the Securities and Exchange Commission (SEC) as a broker-dealer since 1969 and was a member of the National Association of Securities Dealers (NASD). On October 10, 1972, FAI filed an application for dealer registration under the Georgia Securities Act. On the application the general character of FAI's business was listed as the sale of mutual funds and certain tax sheltered *292 investments. On October 20, 1972, the State of Georgia granted FAI a limited dealer's license. Between October 1972 and November 7, 1974, Bridges, Financial Analysts, and FAI participated in the sale of interests in Various programs such as the Premier Corporation Program (cattle herds), Commercial Income Properties Fund, Ltd. (a real estate syndication), and the National Farming Program. In addition, Bridges began to establish and promote his own programs. On November 23, 1972, Bridges organized CH-1, a Georgia Limited Partnership, for the purpose of investing in chinchilla herds. In 1973 and 1974, Bridges promoted five real estate syndications: Tugalloo River Property; La Grange I-185, Ltd.; Cherokee I-75, Ltd.; Orangeburg I-26, Ltd.; and Rockdale County, Ltd. In the fall of 1973, Bridges began to promote negative pick-up movie tax shelters (i.e., where a limited partnership buys a completed movie), starting with Cinefai Associates and the Atlanta Company. In 1974, prior to the promotion of Mulberry, Bridges marketed another negative pick-up movie tax shelter, involving the DN Company, a Georgia limited partnership, and a movie produced by Perlmutter called "Dead of *293 Night." [3] He also promoted two oil and gas ventures involving FAI Resources, Ltd., and FAI Resources II, Ltd. At the same time that Mulberry was being marketed, Bridges was promoting two other movie production service tax shelters, involving the Marietta Company and O.W. Productions. Each of the foregoing promotions was organized around a limited partnership, with either Bridges or Financial Analysts acting as the general partner. FAI, a broker-dealer, usually attended to the underwriting aspects of the promotions. Bridges normally established a new limited partnership for each promotion. By 1974, Financial Analysts was providing clerical services for approximately a dozen limited partnerships. The bulk of its business activity occurred during the last three months of the year when Bridges' clients required tax planning. In 1974, FAI had thirteen or fourteen salesmen actively soliciting clients for various Bridges tax shelters. Bridges would hold a sales meeting every Monday morning in which he would explain the "product" and review the progress *294 of each salesman in lining up investors. During the rest of the week, Bridges and the salesmen would travel their territories and seek commitments from their personal clients for various shelters. On July 26, 1977, SCP Producer's Services Limited brought an action in a Canadian court in Ontario against Bridges and Rossman carrying on business as the Mulberry Company, for the price of certain services rendered during the post-production phase of "Good Idea." A default judgment was taken against Bridges for $64,927.20 on January 5, 1978. On its 1974 partnership return, Mulberry claimed total deductions of $875,147 representing expenses for production of "Good Idea." On its 1975 partnership return, Mulberry claimed total deductions of $434,889 representing expenses for production of "Good Idea." No income was reported on either partnership return. On their 1974 and 1975 joint returns, petitioners claimed their pro rata shares of Mulberry's claimed deductions in the following amounts: 1974
1975
Broyles
$21,660
$10,763
Christiansen
21,660
10,763
Frost
16,243
8,071
OPINION
To be decided here is whether petitioner-husbands, limited partners *295 in the Mulberry Company, are entitled to deduct their shares of the losses represented on Mulberry's partnership returns. Respondent has advanced several reasons to support his disallowances of those losses, the principal one being that advanced in an amendment to his answer, in which he asserted that the expenses giving rise to the partnership's reported losses (the partnership reported no income in either of the years 1974 and 1975, which are here involved), being the expenses of producing the film "Good Idea," were not Mulberry's expenses at all, because Mulberry was not in substance or reality the producer of the film. Petitioners urge that by virtue of Mulberry's having entered into a production services agreement with Tertius (a Canadian limited partnership which owned the screenplay rights and which became the copyright owner of the completed film), under which Mulberry was obligated to furnish all the services for producing the film and to deliver a completed film by a date specified, Mulberry was the producer of the film and was entitled to deduct the production expenses. This very issue was considered only recently by this Court in Estate of Helliwell v. Commissioner,77 T.C. 964 (1981), *296 on appeal (5th Cir., Jan. 29, 1982), and was decided adversely to the taxpayer, a limited partner in a partnership (Champion Production Company) like Mulberry involved in a production services agreement. The Court held in Helliwell that Champion was not the actual producer of the films there involved and was therefore not entitled to deduct the expenses of producing the films. The Court was convinced that Champion's sole function was to provide additional financing and that in substance it had purchased a net profits interest in the films. The somewhat detailed findings of fact make it clear to us that Mulberry was not the actual producer of "Good Idea." The actual producer was, in our opinion, Quadrant. Neither Bridges, the general partner, nor any of the limited partners in Mulberry, were capable of producing a moving picture, nor did they take any active part in the production of "Good Idea." Indeed, in light of Bridges' heavy involvement in marketing tax shelters, he would not have had the time to produce the film even if he had the capabilities. The acquisition of the screenplay, the negotiating for actors and actresses, and all the other pre-production details were handled *297 by persons connected with the established and experienced Quadrant production entity. In short, all that Mulberry contributed to the production of "Good Idea" was $387,000 raised from the limited partners. The fact that one supplier brought suit against Bridges and Rossman (Mulberry's in-house accountant) for services rendered during the post-production phase is not persuasive to us that Mulberry was the producer. There are indications in the record that the supplier also brought the same action against one of the Quadrant subsidiaries. Thus, despite Mulberry's obligations under the production services agreement with Tertius, on the authority of the Helliwell case we find and hold that Mulberry was not the actual producer of "Good Idea." It follows that the expenses it claimed which generated the losses picked up by the limited partners, petitioners here, are not deductible by Mulberry. Consequently, respondent correctly disallowed the losses reported on the petitioners' returns for 1974 and 1975. So holding, it becomes unnecessary to consider or pass upon respondent's alternative contentions. Appropriate orders will be entered in the Broyles, Christiansen, and *298 Frost cases restoring them to the general docket for further proceedings in due course. Petitioner in the Slack case having conceded the Mulberry issue, the Court will withhold an order in that case until it and the other cases involving the Cinefai issues have been disposed of. Appropriates orders will be entered.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Arthur R. Slack, docket No. 3958-80; Charles H. Christiansen, Jr., and Helen W. Christiansen, docket No. 3960-80; and John S. Frost and Ronda B. Frost, docket No. 3961-80.↩
2. In paragraph 31 of the Stipulation of Facts, petitioners conceded that the non-recourse liability incurred by Mulberry in the amount of $813,835 shall not be taken into account for the purpose of computing their respective bases in their partnership interests in Mulberry.↩
3. The DN Company transaction was involved in the case of Siegel v. Commissioner,78 T.C. 659↩ (1982).