GERALD W. KRAETTLI and TERRA L. KRAETTLI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kraettli v. Commissioner
Docket No. 17640-87.
United States Tax Court
T.C. Memo 1988-413; 1988 Tax Ct. Memo LEXIS 447; 56 T.C.M. (CCH) 29; T.C.M. (RIA) 88413; September 1, 1988. Gerald W. and Terra L. Kraettli, pro se. Sara J. Barkley, for the respondent. GALLOWAY
MEMORANDUM FINDINGS OF FACT AND OPINION GALLOWAY, Special Trial Judge: This case was heard *449 pursuant to the provisions of section 7443A(b) of the Internal Revenue Code of 1986, and Rule 180 et seq. [1]
By a notice of deficiency, respondent determined a deficiency in petitioners' 1983 Federal income tax liability in the amount of $ 1,174. The sole issue to be decided is whether petitioners' automobile racing was an activity not engaged in for profit within the meaning of section 183(a). Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Mr. & Mrs. Kraettli, filed a joint Federal income tax return for 1983. They resided in Colorado Springs, Colorado, when they filed their petition herein. FINDINGS OF FACT As of 1974, Mr. Kraettli had been actively engaged in bracket drag racing activities. Bracket racing consists of four levels of competition ranging from the street car level (bracket four) to the super pro level (bracket *450 one). These bracket races are held on either a weekly or bi-weekly basis and usually involve a set purse of approximately $ 300. Mrs. Kraettli's family had been involved in motorcycle racing activities and, as a result, petitioners met at a racing function in 1974. At that time, petitioners were employed full-time in occupations unrelated to racing. With the passage of time, Mrs. Kraettli developed an interest in automobile racing and eventually became quite proficient. The following are the various titles and honors that Mrs. Kraettli earned as a result of her accomplishments as a race car driver: Year
Title
1977
Sportsman of the Year
1979
First Woman to Win Bracket 1 in
Colorado area
1980
PMI Track Champion
1982
3d Place, Division 5
1983
5th Place, Division 5
Drag racing became a consuming passion of petitioners and they devoted an ever increasingly amount of time and effort to this activity. However, petitioners' personal finances constrained their ability to race as frequently as they desired. Petitioners later learned that many of their cohorts partially financed their racing activities by treating racing expenses as business expenses *451 for tax purposes. It was not until after this revelation that petitioners decided to treat their racing activities "as a business." Accordingly, they hired a tax accountant to prepare their income tax returns and began filing a business Schedule C in 1977. However, the tax benefits resulting from these deductions did not completely resolve petitioners' cash flow problems as their budget could only support the expenses of one driver. It was therefore decided that the better driver, Mrs. Kraettli, would compete in the races while Mr. Kraettli would act as mechanic during the six-month racing seasons. In order to further improve their financial situation, petitioners implemented a new retrenchment strategy. Beginning with 1977, and through the 1980 racing season, petitioners gradually phased out the various brackets in which they would compete and eventually raced exclusively in bracket one, which awarded the greatest amount of prize money. Petitioners' ultimate goal was to enter the division races which had even larger purses and, more importantly, paid "contingencies," which were not paid at the bracket levels. "Contingencies" are sponsorship prize monies paid to a driver contingent *452 upon a driver's actual use of a sponsor's product in, and display of the sponsor's decal on, the winning vehicle in a division race. More than 100 sponsors participate in this contingency program which is administered in conjunction with the National Hot Rod Association (NHRA). It is generally recognized that contingency sponsorship of a vehicle is an indispensable element of a driver's financial success since the contingency program provides drivers with a potential source of income far greater than the actual prize purses. For example, contingency monies paid to the winners of the divisional and national races in 1983 were approximately $ 50 to $ 200 and $ 250, respectively, per sponsored auto part per race. Unless a driver wins nearly every race during the season, that driver will not show a profit from racing activities without vehicle sponsorship. Beginning with the 1983 racing season, contingencies were paid not only to first place, but also to second place winners. Petitioners' goal was eventually realized in 1980, as Mrs. Kraettli began racing at the "super comp" level. By 1983, she began racing exclusively at the super comp level of Division 5, a professional class *453 of racing held at the division races sponsored by the NHRA. Petitioners sought to attract sponsors for their race car in the formative years of their "business." Sponsors would provide free or below-market priced products or services. Among the various methods by which petitioners attempted to attract sponsors were forming a club to promote auto racing and attending media events. Mrs. Kraettli founded the Bracket Racers Club of Southern Colorado and acted as its public relations liaison. Mrs. Kraettli also attended two media events in 1980-81. Demonstration races were held at these media events in an effort to generate media interest in automobile racing so as to reap the potential windfall of free media exposure. It also provided a good opportunity to foster relationships with those divisional sponsors and representatives that attended. No media events were held in 1983. It later became apparent to petitioners that contingency sponsorship was crucial to the financial viability of their racing operations. In 1979, Mrs. Kraettli compiled a "press package" which was a collection of media clippings featuring Mrs. Kraettli's racing achievements, including a chronology highlighting *454 her growth and accomplishments as a racer. The press package served as a marketing tool that Mrs. Kraettli's father utilized during presentations before potential sponsors. Mrs. Kraettli's father had been a motorcycle dealer for more than 14 years. Consequently, he was able to cultivate many contacts within the racing community. Although all of the active solicitation of sponsors occurred during the summer of 1980, Mrs. Kraettli's father testified that, from time to time, he continues to promote the idea of sponsorship with business acquaintances. However, the press package he employs has not been updated since 1980 even though more recent press materials exist. Over the years, petitioners were able to attract the following sponsors: Benefits Petitioners
Year(s)
Sponsor
Received From Sponsors
1979
Bob's Corvette Shop
Free painting
of race car.
1979-81
H. J. Kraettli & Sons, Inc.
$ 500 per year.
1979-81
Pennzoil
50% discount on
purchase of Pennzoil
Brand Motor Oil.
1979-
ASA Muffler Shop
Free Engine Maintenance.
(indefinite)
Mr. Kraettli left his employer, H.J. Kraettli & Sons, Inc., after the business was sold *455 in October 1981. Petitioners decided to seize this opportunity to pursue their racing activities on a more serious level and purchased a new racing car in December of 1981. Mr. Kraettli was now able to pursue the responsibilities of updating, maintaining and transporting the race car on a full-time basis. The asset base of petitioner's racing equipment had reached approximately $ 21,000 by 1982. Nevertheless, by November 1982, Mr. Kraettli was forced to return to his previous occupation as a land surveyor since petitioners' racing endeavors proved to be anything but lucrative. Petitioner's racing activities continued until the engine of their race car blew up and was completely destroyed during the last race of the 1983 season. Petitioners neither attended nor entered any races during the 1984-86 racing seasons. Consequently, no losses were claimed for those tax years. By 1987, the race car engine had finally been rebuilt and petitioners resumed their racing activities. [2]
In sum, the relevant financial data gleaned from the record is the following: Gross Income
Expenses
Net
Unrelated To
Number Of
Total
(Includes)
Profit
Racing Activity
Year
Races Entered
Winnings
(Depreciation)
(Loss)
(Wages and Salaries)
1977
45
$   659
$  3,686
$ (3,027)
$ 17,112
1978
41
190
4,709
(4,519)
19,660
1979
32
* 490
2,824
(1,834)
19,778
1980
26
* 675
3,580
(2,402)
28,093
1981
26
* 1,710
7,290
(5,080)
28,335
1982
15 ** 1,600
10,353
(4,653)
16,342
1983
8
1,090
7,930
(6,840)
23,350
*456 OPINION Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b) provides for the following exceptions to section 183(a) nondeductibility: (1) Deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed. Section 183(b)(1); sec. 1.183-1(b)(1), Income Tax Regs.; and (2) deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(b)(2). Section 183(c) defines an activity not engaged in for profit as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- *457 For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.
Section 183(d) creates a rebuttable presumption that an activity was engaged in for profit where gross income derived from an activity exceeds the deductions for any 2 of 5 consecutive taxable years. Because the petitioner's automobile racing "business" has operated at a loss since its inception in 1977, such presumption is not in effect in this case. The test for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162 is whether the individual's primary purpose and intention in engaging in the activity is to make a profit. Golanty v. Commissioner,72 T.C. 411 (1979); Allen v. Commissioner,72 T.C. 28 (1979). The taxpayer's expectation of profit need not *458 be a reasonable one; it is sufficient if the taxpayer has a bona fide objective of realizing a profit. Sec. 1.183-2(a), Income Tax Regs; Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The issue of whether a taxpayer engages in an activity with the requisite objective of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case; sec. 1.183-2(b), Income Tax Regs.; Siegel v. Commissioner,78 T.C. 659, 699 (1982); Rule 142(a). Section 1.183-2(b), Income Tax Regs., sets forth a nonexhaustive litany of the relevant factors which are to be considered in determining whether an activity is engaged in for profit. Golanty v. Commissioner, supra at 426. Among them are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; *459 (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No one factor is determinative of the taxpayer's objective to make a profit ( sec. 1.183-2(b), Income Tax Regs.). However, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention, Bessenyey v. Commissioner,45 T.C. at 274, and objective facts are accorded greater weight than are mere statements of intent. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). As this Court stated in Bessenyey v. Commissioner, supra at 274: the presence of losses in the formative years of a business, * * * is *460 not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years.
We are convinced that the petitioners did not have an objective to make a profit from their automobile racing activities, and that since such activity was not potentially profitable, it could not "recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, supra at 274. The record contains information concerning petitioner's racing activities for a period of 7 years -- 1977 through 1983 -- and in each of those years the petitioner incurred a loss, the largest of which was incurred during the year in question. For the 7 years, the losses totaled $ 28,345. A record of such losses over so many years is persuasive evidence that the petitioner did not have the requisite objective of making a profit. Sec. 1.183-2(b)(6), Income Tax Regs.; Golanty v. Commissioner, supra at 427. *461 Nor could petitioners even have hoped to realize a profit solely for the year in question. Total potential winnings from the six division races entered in 1983 were $ 7,700 [3] compared to $ 7,930 in expenses incurred for that year. Based on petitioner's testimony that winning one race per season is considered to be "doing well" for that season, petitioners could not have even approached the break-even point. Aside from the fact that petitioners' winnings never offset expenses in seven consecutive years, petitioners could not have anticipated financial relief from potential sponsorship income. Even during the height of petitioners' sponsorship solicitation activities, they failed to attract any substantial sponsors. Petitioners raced on a level where sponsorship was necessary to ensure profitable operations. Lack of substantial sponsors manifests a lack of bona fide objective of profit. See Casida v. Commissioner,T.C. Memo, 1979-267. *462 Although petitioners were awarded a NHRA Gold Card, which waived the race car and automobile pit entry fees, it nevertheless failed to provide petitioners with any source of positive income. By 1983, petitioners abandoned their sponsorship solicitation activities for all practical purposes, and they failed to update the press package, their only marketing tool. See section 1.183-2(b)(3), Income Tax Regs.
Moreover, petitioners could not have possessed a bona fide objective of profit from potential capital appreciation in the assets employed in their racing endeavors. Sec. 1.183-2(b)(4), Income Tax Regs. At trial and on brief, petitioners contended that Mrs. Kraettli is an asset appreciating in value based on her history of honors and awards and increasing levels of racing experience and exposure. Irrespective of the fact that, in the vernacular, Mrs. Kraettli may have been an "asset" to her team, the evidence reveals that petitioners' tangible racing asset base consisted largely of wasting assets. Indeed, petitioners failed to realize capital appreciation on racing equipment that was sold in 1982 and experienced the loss of *463 their race car engine when it blew up in 1983. The existence of personal pleasure or recreation may indicate that an activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. However, an activity can still constitute a trade or business even though the taxpayer also derives pleasure therefrom. See Wilson v. Eisner,282 Fed. 38, 42 (2d Cir. 1922); see also Demler v. Commissioner,T.C. Memo. 1966-117. Furthermore, we are mindful of the principle that merely because an activity was previously carried on as a hobby does not preclude a finding that it has become a trade or business. Demler v. Commissioner, supra.The record before us clearly indicates that when petitioners decided to treat their hobby as a "business" in 1977, by filing a Schedule C with their Federal income tax return, they viewed their racing activities as merely a vehicle by which to subsidize their personal recreational expenses. A bona fide objective of making a profit was lacking. This lack of a bona fide objective for *464 profit is also manifested by petitioners' casual attitude towards that activity. Interest payments on loans used to finance their racing activities were treated by petitioners as Schedule A itemized interest deductions rather than Schedule C interest on business indebtedness deductions for tax years 1977-83. A separate checking account for petitioners' racing activities was not maintained for 1983. Nor did they maintain books of account, balance sheets, budgets and never attempted to determine their financial break-even point, much less follow generally accepted accounting principles. These objective facts cast doubt on petitioners' assertions that they were, in fact, maintaining a business-like activity. A failure to maintain complete an accurate books may indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners attribute the inadequacy of their recordkeeping to the advice rendered by their tax preparer/consultant who informed petitioners that their recordkeeping was more than legally sufficient. Nevertheless, *465 in the instant case, maintaining more complete financial records would have enabled petitioners to track and to better assess their financial position in order to assist them in realizing a profit, apart from merely securing tax benefits. We find petitioner's indifference in this regard as indicia of a lack of an actual and honest objective of profit. Moreover, but for the existence of substantial income from full-time employment in occupations unrelated to racing, petitioners could not have sustained the perennial losses generated by their racing activities. Sec. 1.183-2(b)(8), Income Tax Regs. Thus, the only objective of benefits that petitioners could have anticipated by continuing their racing activities were the tax benefits flowing from these losses. This was especially true for 1983, since by that time petitioners failed to realize a profit even after implementing several strategies and Mr. Kraettli's attempt at earning a livelihood from racing in 1982. In conclusion, we find that petitioners did not entertain an actual and honest objective of realizing a profit from their racing activities in 1983. Consequently, petitioners' racing activities *466 never transcended its status as a mere recreational activity anytime during the year in question, and, as such, was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Accordingly, the loss claimed by petitioners during 1983 is not deductible. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
2. Profit/loss data for 1987 racing activities were unavailable at the time of petitioners' trial. ↩
*. Does not include $ 500 of sponsorship income. ** Does not include $ 4,100 in proceeds from sale off race car and equipment. ↩
3. This figure was taken from petitioners' Memorandum of Legal Authorities. As previously noted, petitioners' actual 1983 winnings totaled $ 1,090. ↩